FILED

2021 Sep-30  PM 02:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **NICHOLAS BERNARD ACKLIN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **5:18-cv-00885-LSC** |
| | ) | |
| | ) | |
| **JEFFERSON DUNN,** | ) | |
| **Commissioner, Alabama** | ) | |
| **Department of Corrections, et al.** | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM OF OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Nicholas Bernard Acklin ("Acklin"), a death row inmate at Holman Correctional Facility in Atmore, Alabama. Acklin challenges the validity of his 1998 convictions on one count of capital murder and two counts of attempted murder and sentence of death in the Circuit Court of Madison County, Alabama. Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Acklin's petition for habeas relief is due to be denied.

## I.      FACTS OF THE CRIME

The trial court set forth the following facts of the crime in its sentencing order, which were quoted with approval by the Alabama Court of Criminal Appeals ("ACCA") on both direct appeal and postconviction review:

Late on the night of September 25, 1996, Nicholas Bernard Acklin and two companions, all heavily armed, entered the home of Ashley Rutherford on University Drive in Huntsville, Madison County, Alabama. Acklin, Joseph Wilson, and Corey Johnson held seven people at gunpoint in a 13' x 18' room and, for nearly two hours, assaulted, tortured, and humiliated them. Then, shortly before midnight, Acklin and Wilson fired 19 rounds of 9mm ammunition, shooting 6 of the 7 victims in or about the head. Four of the six victims died, two survived the shooting, and one victim escaped.

The events giving rise to these slayings occurred approximately one week before the murders took place. At this time, Joseph ("Joey") Wilson and Corey Johnson, while visiting the home of Ashley Rutherford, stole a cellular telephone and a small bag of marijuana. The theft of the cellular telephone prompted Rutherford and the owner of the phone, Lamar Hemphill, to file a police report with the Huntsville Police Department. As a result of the police report being filed, Wilson was questioned by the police regarding the theft of the phone. Once Wilson learned that a police report had been filed, he became angry. On the night of September 25, 1996, Wilson, Acklin, and Johnson went to Ashley Rutherford's home seeking revenge against those persons they deemed responsible for filing the report.

Early in the evening of September 25, 1996, Ashley Rutherford's fiancée (Michelle Hayden) and two of his friends (Brian Carter and Lamar Hemphill) sat in Rutherford's garage apartment watching television and awaiting Rutherford's return from work. Later, Michael Beaudette, another friend of Ashley Rutherford, arrived and joined Hayden, Carter, and Hemphill in watching television and socializing. At approximately 10:00 p.m., Mike Skirchak and Johnny Couch, while driving past Rutherford's home on University Drive, noticed Michael

Beaudette's car and decided to stop and talk for awhile with Beaudette and the others. At approximately 10:05 p.m., Skirchak and Couch decided to leave. As the two young men exited Rutherford's home, they were met by Nicholas Acklin, Joey Wilson, and Corey Johnson, who forced them back inside the garage apartment.

Once inside the apartment, Acklin, Wilson, and Johnson began asking repeatedly, "Who filled out the warrant?" When no one would give them a satisfactory answer, they brandished handguns and began physically assaulting Skirchak, Couch, Beaudette, Carter, and Hemphill. Specifically, these five young men were kicked, slapped, punched, spat on, and beaten with a whiskey bottle by Wilson and Johnson. A few times during these assaults, Acklin took Michelle Hayden outside and made sexual advances towards her. Acklin fondled Hayden's breasts and repeatedly asked her to pull down her pants. After approximately an hour of the aforementioned behavior, Ashley Rutherford arrived home from work and he was immediately confronted by Johnson, who forced him into the apartment. Once inside, Rutherford was also interrogated about the police report. He, too, was beaten and threatened. In fact, as the night progressed, two of the three assailants, Nicholas Acklin and Joey Wilson, grew increasingly violent and more demeaning.

For example, Acklin placed a .357 magnum revolver in Rutherford's mouth and shoved it into his throat until Rutherford gagged. Acklin also placed Michael Beaudette in a headlock and placed the same .357 magnum revolver under his chin. Wilson kicked and stomped Johnny Couch until he was almost unconscious and then cut his ponytail off with a pair of scissors. A short while after this incident, Acklin made Michelle Hayden accompany him outside while he stole Brian Carter's car stereo from Carter's car. When Acklin returned to the overcrowded apartment, he threw a pocket-knife at Brian Carter's feet. Then, Acklin turned to Wilson, who was holding a Ruger 9mm semi-automatic handgun and proclaimed, "Look, he has a knife!" Both Acklin and Wilson continued humiliating the victims by making them do self- degrading things, such as take off their pants and sit exposed in their underwear. At one point in the evening, Wilson placed his handgun on a dresser and dared anyone to try and grab it. Furthermore,

following one of the several occasions that Acklin took Michelle Hayden outside, Acklin went back inside the apartment and told her fiancée, Ashley Rutherford, that his girlfriend had just performed oral sex on him.

As the night progressed, all seven victims asserted that they did not know anything about a warrant being filed against Wilson. However, Rutherford and Hemphill did admit to their attackers that a police report had been filed for the stolen cellular phone, but no one had sworn out a warrant. Despite the assertions by Rutherford and Hemphill, as well as from the others, the anger of both Acklin and Wilson rose to a dangerous crescendo. Just before midnight, Acklin and Wilson made all seven victims give them their driver's licenses and identification cards. At this point, Corey Johnson tried to calm Acklin and Wilson down by telling them that the victims were not going to talk and that they didn't have to shoot anyone. Unfortunately, Acklin and Wilson ignored Johnson and began shouting for someone to go and start the car. After yelling back and forth to each other to go start the car, Acklin finally left Wilson inside and went to start Wilson's car. At this point, Wilson was holding the seven victims at gunpoint and demanding that someone tell him who filed what he claimed was a warrant against him. When Acklin returned from outside, he was holding one of the two Lorcin 9mm handguns that had been tucked in his waistband earlier that night. As Wilson continued to demand answers to his questions, Acklin proclaimed, "Fuck it," and placed the Lorcin 9mm against the back of Ashley Rutherford's head and fired. Then, in a methodical manner, as each of the other victims sat and watched, Acklin shot Lamar Hemphill once in the head, shot Johnny Couch twice in the head, shot Michael Beaudette once in the head and once in the upper leg, and shot Michelle Hayden in the side of her face, in her arm, and in her abdomen. . . Joey Wilson shot Brian Carter six times in the neck and chest. As soon as the shooting began, Mike Skirchak ran out of the back door of the apartment without any gunshot wounds.

After having fired 19 rounds of ammunition inside the apartment, Acklin, Wilson, and Johnson fled. Ashley Rutherford, the first person shot by Acklin, laid in a pool of his own blood and pretended to be dead until he was sure that his attackers had left the apartment. Once he knew

that they were gone, Rutherford left the garage apartment and went into the main part of the house to get help from his grandmother. After he told his grandmother to call an ambulance, Rutherford went back to assist his fiancée Hayden, who was lying in the doorway leading to the main part of the house. At approximately 12:30 a.m., Madison County emergency medical technicians arrived on the scene and determined that Michael Beaudette, Brian Carter, and Johnny Couch were already dead. Michelle Hayden was alive, but critically wounded, and Lamar Hemphill died minutes after medical technicians arrived.

Approximately one hour later, Madison county sheriff's deputies arrived at the home of Nicholas Acklin on Mt. Lebanon Road in Madison County. . . Upon searching the home, the deputies found two Lorcin 9mm semi-automatic pistols and one Ruger 9mm semi-automatic pistol. The deputies also retrieved the clothes that Acklin had worn earlier in the evening. Inside one of Acklin's pockets, the deputies found the driver's license of Michael Beaudette.

Vol. 2, Tab #R-2, at C. 280–85; *see also Acklin v. State*, 790 So. 2d 975, 982–84 (Ala. Crim. App. 2000); *Acklin v. State*, 266 So. 3d 89, 93–95 (Ala. Crim. App. 2017).

## II.   PROCEDURAL HISTORY

Acklin was indicted by a Madison County grand jury on January 10, 1997, on two counts of attempted murder, one count of capital murder for murder during a burglary, and one count of capital murder for murder of two or more persons pursuant to one scheme or course of conduct, in violation of sections 13A-4-2, 13A-5-40(a)(4), and 13A-5-40(a)(10) of the Code of Alabama (1975).

The case was presented to a jury beginning on October 19, 1998. Acklin was

represented at trial by attorneys Behrouz Rahmati, Kevin Gray, and others. In its case in chief, the State offered the testimony of 14 witnesses, including six law enforcement officers, two medical professionals, three Alabama Department of Forensic Sciences employees, and the three surviving victims. Although the defense called no witnesses, counsel cross-examined the State's witnesses. On October 23, 1998, the jury found Acklin guilty of one count of capital murder of two or more persons and two counts of attempted murder.

The penalty phase was held the next day. The State briefly called family members of each of the four decedents. The defense presented eight witnesses, including Acklin's parents, his aunt, his grandmother, a retired police officer, an employee at a local youth organization, and two reverends. The jury was charged on two aggravating circumstances: (1) that Acklin knowingly created a great risk of death to many persons and (2) that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. On October 24, 1998, the jury recommended by a vote of ten to two that Acklin be sentenced to death.

At the sentencing hearing before the trial judge on November 6, 1998, the State offered no further evidence. Acklin's father, Theodis Acklin ("Theodis"), pleaded for mercy before the trial court. The trial court accepted the jury's recommendation and sentenced Acklin to death.

A notice of appeal was filed on November 9, 1998. Acklin was represented by different counsel on direct appeal. The ACCA affirmed all of Acklin's convictions and his sentence of death and denied his application for rehearing. *Acklin*, 790 So. 2d at 1012. The Alabama Supreme Court denied certiorari on January 12, 2001, *Ex parte Acklin*, 790 So. 2d 1012 (Ala. 2001), and the United States Supreme Court denied certiorari on June 25, 2001, *Acklin v. Alabama*, 533 U.S. 936 (2001).

On June 18, 2002, Acklin filed his petition for postconviction relief in the circuit court pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. Over the next 11 years, Acklin filed three amended petitions and numerous requests for discovery. The circuit court summarily dismissed certain claims, but on December 9–12, 2013, the circuit court held a four-day evidentiary hearing on the remaining claims. Acklin called nine witnesses at the hearing but did not testify himself. On April 8, 2015, the circuit court denied Acklin's remaining postconviction claims in a detailed 45-page order. Vols. 34–35, Tab #R-85, at C. 3995–4039.

Acklin filed his appellate brief in December 2015, raising only four issues, each of which was addressed at the evidentiary hearing. Two years later, the ACCA affirmed the circuit court's decision in a lengthy opinion and denied Acklin's application for a rehearing. *Acklin*, 266 So. 3d at 121. The Alabama Supreme Court

denied certiorari in June 2018. Vol. 47, Tab #R-105. The United States Supreme Court did likewise in March 2019. *Acklin v. Alabama*, 139 S. Ct. 1374 (2019).

On June 8, 2018, Acklin timely filed the present petition for a writ of habeas corpus. (Doc. 1.) The petition was held in abeyance pending the Supreme Court's decision regarding whether to grant certiorari in Acklin's state postconviction proceedings. Following denial of certiorari, this Court ordered the parties to proceed. The habeas petition is now fully briefed and ripe for review.

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal

habeas corpus relief under § 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010) (quotation marks and citations omitted).

## A.    Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). This means that "'[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the rule. *Id*. The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)).

Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not

enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5–6 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted). If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).
>
> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted—i.e., the petitioner never presented the claim to the state court—a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519–20 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can

simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

## B.   Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (citations and internal quotation marks omitted).

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. *Id.* at 750. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (internal quotation marks, brackets, and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537 (1986) (quoting *Carrier*, 477 U.S. at 496), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995) (emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

## C. AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254 is not procedurally defaulted but has instead been adjudicated on the merits in state courts, this Court is still restricted in its ability to grant relief on those claims by §

2254(d). The AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted). To grant habeas relief on a claim, this Court must not only find that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting § 2254(d)). The burden of showing that an issue falls within § 2254(d)(1) or (d)(2) is upon the petitioner. *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). Section 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis.") (citation omitted). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially

indistinguishable from a decision of th[e] Court but reaches a different result."

*Brown v. Payton*, 544 U.S. 133, 141 (2005) (citation omitted). On the other hand, to

determine whether a state court's decision is an "unreasonable application" of

clearly established federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and quotation marks omitted)

(emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The

question under AEDPA is not whether a federal court believes the state court's

determination was incorrect but whether that determination was unreasonable—a

substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a

federal court may grant habeas relief under § 2254(d), 'a state prisoner must show

that the state court's ruling on the claim being presented in federal court was so

lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement.'") (quoting *Harrington*, 562 U.S. at 103). As the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward,* 592 F.3d at 1155–56 (alterations in original) (quoting § 2254(e)(1)).

## D.   The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary

16

to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

### E.   The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the following two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

Because *Strickland*'s preceding two-part test is clearly framed in the conjunctive, a petitioner bears the burden of proving both "deficient performance"

and "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, [ ] or vice versa.").

In order to establish deficient performance, a habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. That reasonableness is judged against "prevailing professional norms." *Id*. Moreover, under *Strickland*, lower federal courts must be "highly deferential" in their scrutiny of counsel's performance. *Id*. at 689. As the *Strickland* Court outlined:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are

countless ways to provide effective assistance in any given case. Even
the best criminal defense attorneys would not defend a particular client
in the same way.

*Id.* (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel
would have taken the action that his counsel did take" to overcome the presumption
that counsel's conduct fell within the wide range of reasonable professional
assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of counsel's performance
is judged from the perspective of the attorney, at the time of the alleged error, and in
light of all the circumstances. *See, e.g., Newland v. Hall*, 527 F.3d 1162, 1184 (11th
Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the
time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S.
at 689).

To satisfy the prejudice prong, a habeas petition "must show that there is a
reasonable probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.
Stated differently, "[a] finding of prejudice requires proof of unprofessional errors
so egregious that the trial was rendered unfair and the verdict rendered suspect."
*Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation

marks omitted). Further, the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 101. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

## IV.   DISCUSSION OF ACKLIN'S CLAIMS

### A.   Acklin's claim that he was denied his right to conflict-free counsel in violation of the Sixth and Fourteenth Amendments

Acklin's first claim is that he was denied the right to effective assistance of counsel because his trial counsel had a conflict of interest. Specifically, Acklin contends that Behrouz Rahmati ("Rahmati"), his lead trial attorney, had loyalties divided between his client (Acklin) and the person paying him (Theodis, Acklin's father), and he chose a course of action that harmed his client and protected his source of income. In support, Acklin states the following. Theodis was making payments towards Rahmati's legal fees as the trial neared. Two days before Acklin's trial, Rahmati learned that Theodis had abused Acklin and his brothers when they were children. Rahmati could have used the evidence of childhood abuse in mitigation at Acklin's penalty phase, but Theodis told Rahmati that if Rahmati presented such evidence, he would be "done helping with this case." Vol. 40, Tab #R-90, TR. 112, 118. At that point, Rahmati had a conflict of interest, of which he should have, but did not, make the trial court aware. Instead of informing the court about the conflict and the abuse evidence, Rahmati met with Acklin, and Acklin

signed a typewritten document waiving his right to present the abuse evidence as mitigation. Finally, Rahmati then called Theodis to testify at both the penalty phase and the judicial sentencing proceeding that he was a supportive father and that Acklin had a positive upbringing. The trial court later invoked Theodis's testimony when imposing the death penalty in its sentencing order.

Acklin raised this claim for the first time in his Rule 32 petition,[1] and Acklin presented testimony and evidence in support of it at the circuit court's December 2013 evidentiary hearing. The circuit court ultimately denied Acklin's claim on the merits. Vol. 35, Tab #R-85, at C. 4006–08. On appeal, the ACCA affirmed. The ACCA's thorough discussion of the claim and the facts underlying it[2] is repeated here:

> Acklin was represented at his trial by Behrouz Rahmati and Kevin Gray.FN5 The evidence at the Rule 32 hearing indicated that Rahmati agreed to represent Acklin after he met with Acklin's mother, Velma Acklin Evans ("Velma"), and Acklin's father, Theodis Acklin ("Theodis"), in September 1996, a few days after the offenses occurred. Velma signed an agreement with Rahmati providing for a $25,000 retainer and an hourly rate of $150 per hour. . . .

---

[1]     Alabama Rule of Criminal Procedure 32.2(d) mandates that all claims of ineffective assistance of counsel "must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable." The State does not argue that Acklin should have raised any of his ineffective assistance of trial counsel claims earlier.

[2]     Some of the facts mentioned by the ACCA and quoted below also pertained to a separate claim Acklin raised in his postconviction proceedings—that Acklin's parents' inability to pay the $25,000 retainer fee created a conflict of interest because "any work performed on Acklin's case would reduce the amount of work counsel could do on a case which would actually generate income." Acklin does not repeat that claim in his federal habeas proceeding.

> FN5 Rahmati and Gray testified at the Rule 32 evidentiary hearing.

At the time Rahmati was retained, he knew that Velma and Theodis were divorced. Regarding his $25,000 retainer and Velma's ability to pay him, Rahmati testified that it was "obvious from Day 1" that Velma was in "financial distress" and Rahmati "suspected strongly [that he and Gray] were never going to get paid." (R. 56.)

During Rahmati's testimony, Acklin introduced billing statements and "monthly billing" letters from Rahmati's law firm.FN6 That evidence, along with Rahmati's testimony, indicated that Velma paid several monthly payments of around $100 toward the retainer, for a total of about $1,900. Regarding these monthly payments, Rahmati testified that in his experience, when a parent of a client makes monthly payments of $100 to $200, "that's a very strong signal they can't afford paying." (R. 56.)

> FN6  Rahmati testified that his law firm routinely sent out billing statements or letters in the middle of each month. Acklin introduced several of those letters into evidence.

The evidence also indicated that by the time of Acklin's October 1998 trial, Theodis had made three sporadic payments totaling $2,900. (R. 80.) Those three payments of $700, $2,000, and $200 occurred in March 1998, September 1998, and October 1998, respectively. Rahmati testified that he did not know what convinced Theodis to pay toward the retainer, but he said that based on his interactions with Theodis, Velma, and Acklin, he did not think Theodis was "really trying as hard" as Velma to help with Acklin's case.

The record indicates that, based on billing statements, trial counsel spent more than 400 hours preparing for Acklin's trial. . . .

23

In preparing for Acklin's trial, both Rahmati and Gray testified that they felt relatively certain they would need to be prepared for a penalty phase, and they began preparing for that phase in advance of the trial. Trial counsel were in consistent contact with Acklin and his family, and they interviewed several potential character witnesses, many of whom testified during the penalty phase.

The record indicates that trial counsel knew Acklin allegedly had used alcohol and marijuana at the time of the crimes. Counsel consulted experts about the possible effects those substances could have had on Acklin, particularly because he was a diabetic. Counsel also examined a report of a forensic psychological evaluation performed on Acklin. Ultimately, however, counsel determined that, in their opinion, none of the information from the experts or the evaluation would have been beneficial to Acklin in either the guilt phase or the penalty phase.

Counsel also testified that they asked Acklin and his parents about Acklin's childhood but that they were not told anything remarkable or out of the ordinary. On October 17, 1998—two days before Acklin's trial was to begin—Velma met alone with Rahmati, however, and told Rahmati that Theodis had perpetrated severe abuse against her and their children, including Acklin. This abuse, according to Velma's testimony at the evidentiary hearing, became very intense when Velma told Theodis she had had an affair. In 1982, within a year of the disclosure of the affair, Velma and Theodis were divorced, and Theodis was given full custody of the couple's three sons.FN7

> FN7 When questioned about this, Velma testified that "when the divorce papers come to the home, I remember I signed them, and that's all I know. I didn't read them at the time." (R. 268.)

> When asked about whether she was ever "concerned for [her sons'] safety," Velma testified:
>
> "I didn't feel that [Theodis] would hurt them, you know; I didn't feel like he would really actually hurt them. But I knew that his discipline, or how he would handle it, affected them. But I never thought that he would actually hurt them."
>
> (R. 268–69.)

At the evidentiary hearing, Velma and her son Steve Acklin testified about the abuse. The abuse included multiple allegations of Theodis threatening Velma and the children with a gun. Velma testified that Theodis "would have a gun in his hand, and he would be shaking it, and he would just shove it down [her] mouth." (R. 219.) Acklin and his brothers "would be screaming, telling their dad not to hurt their mom." (R. 220.) Velma also testified that she once fell from a second-floor window during a fight with Theodis over a rifle, which resulted in her being hospitalized. (R. 225–29.)

Rahmati testified that, when he first learned of the abuse two days before Acklin's trial, he "was very surprised that they never disclosed those details to us, even though we had discussed, with the whole family that we could talk to, with the exception of the brothers [who, Rahmati thought, were incarcerated]." Once he learned of the abuse, Rahmati talked to Theodis. Rahmati testified:

> Q.   What did you say to [Theodis] after Velma told you about the abuse?
>
> A.   I told [Theodis] that I had learned about the—or that [Velma] had told us about the physical and the mental abuse, more or less at his hands to

paraphrase, that he had put [Acklin] through and [Velma] through and the brothers through. And obviously, at that point, you know, I had a different opinion and vision of [Theodis].

. . .

. . . [And] I asked him if he would consider testifying regarding that so we could at least—you know, first I wanted to see if he was willing to talk to me about it to see if, in fact, it was true, (one); (two), if it was true, what his reasons were as to why he may have been like this towards his kids or towards his wife.

Q.   Right. Then if he had told you that information, would you have then talked to him about possibly getting on the stand at the trial and relating this?

A.   Sure. Yes, that's what I did, and he wasn't happy about that idea.

Q.   What do you mean, "He wasn't happy"?

A.   He wasn't happy. He didn't appreciate the idea that his ex-spouse, [Velma], had disclosed these facts to me. I can't remember what he specifically said. It was as if, "It's all not true." I told him, "Look, this is critical. You can help your son possibly, possibly. We've got a stacked deck against us as it is."

In my opinion, if the father truly—even if the father was abusive, if he truly loved his son, he would appear in court, if needed, to help. He took a very aggressive posture with me.

Q.   What does that mean?

A.     He wasn't happy. As I recall, we were in [the] office, and I can't remember if [Velma] was there or not. He literally got up as he started hearing what I was saying about what [Velma] had said. He literally stood up, and he was like, "I can't believe they are doing this," or "They are going there," something to that effect. Visibly, he was angry, and he said, "You tell [Acklin] if he wants to go down this road, I'm done with him," to that extent.

Q.     "I'm done with him"?

A.     More or less. If I recall, that was the verbiage he used. He got up and walked out of my office. And if I recall, as he was walking out, I told him, "[Theodis], I will do whatever I need to, to get you to this sentencing phase; I just want you to know that," and I don't think he even said anything. I was talking to the back of his head as he was walking out. He left, and that was it.

(R. 110–12.)

As to whether Rahmati considered putting this evidence on during the penalty phase, Rahmati said that he did.FN8 Rahmati testified that he believed that the allegations were true and that, when he went to talk to Acklin the next day, Acklin confirmed that they were true. Rahmati's testimony on his interaction with Acklin was as follows:

FN8 Rahmati described the potential benefit of the evidence in the following manner: "I think any human being that listens to kids growing up in that environment could feel like maybe they turned out the way they did because of that, and so

27

they could possibly find some
sympathy." (R. 117.)

Q.    You said . . . that you got confirmation from Nick
      Acklin about what Velma said, right?

A.    Yes, sir.

Q.    You honestly told Nick everything that happened
      with Velma, right?

A.    Yes, sir.

Q.    You were open with him?

A.    Sure.

Q.    Told him everything—

A.    Yes.

Q.    —as to Velma?

A.    As to what his mother told me, yes, and about
      discussions with his father as well.

Q.    So discussions with the father; you told him
      everything that the father said? . . . The father
      getting up and leaving your office? . . . And what the
      father told you?

A.    Yes, sir.

(R. 131–32.)

       According to Rahmati's records, he consulted with Acklin for
two hours at this time. Counsel Gray also met with Acklin the same day.

Rahmati explained to Acklin that Velma, Theodis, and Acklin's brothers could be called to testify about the abuse and that the jury could consider that testimony as mitigating. Acklin, however, steadfastly refused to permit Rahmati to introduce the evidence. Rahmati testified:

> A.    . . . [Acklin] admitted that the physical and mental abuse took place, but he specifically stated he did not want me to introduce that evidence into the case because he didn't want to put his father in that position, or to really put his family in that position. I urged him that this was important. How much impact would it have, if any, I wasn't sure, but I felt certainly that we would need to try to introduce it. He didn't want to—if I recall, he said they didn't— if I recall, [Acklin] said something to the effect of, "That didn't cause me to be here. I don't want to ruin their lives or have anything like this to come out on them." So he specifically required us not to— instructed us not to subpoena his father or introduce this evidence.

> Q.    As a result of what your client told you, did you ask him to memorialize his instructions in any specific way?

> A.    Yes, sir. Because we felt so strong about the need to try to introduce this evidence and the fact that he had instructed us not to, I felt the need to memorialize it in the form of a writing that we asked [Acklin] to sign, which he signed, just for me to have in my file.

>       . . .

> Q.    Did you threaten [Acklin] in any way in order to get him to sign this particular document?

A.     Absolutely not.

Q.     Now, if you could, please read the last sentence beginning, "I have expressly."

A.     "I have expressly forbidden them to mention or present such evidence or argue such evidence during any part of the trial proceeding, including either the guilt or the penalty phase."

Q.     When he refers to "such evidence," what is the particular evidence you understood he was forbidding you and Mr. Gray from presenting either at the guilt phase or the penalty phase?

A.     It was primarily the physical and the verbal abuse that [Velma] told us that [Theodis] carried out on the family, including, I think, the reference to the gun, pointing the gun at the kids, telling them he was going to kill them, things like that.

(R. 164–66.)

The statement signed by Acklin provided in full:

I, Nicholas Bernard Acklin, hereby acknowledge that my attorneys, Behrouz K. Rahmati and Kevin C. Gray, have consulted with me and advised me regarding certain potentially mitigating evidence, which they are prepared to offer on my behalf. This mitigating evidence consists of testimony from my mother and possibly other siblings and family members that I suffered some degree of abusive behavior during my formative years at the hands of my father. Such behavior included, but was not limited to, my father pointing guns at me. My above-mentioned attorneys have advised me that this evidence could possibly be considered by a jury in mitigation of any aggravating circumstances argued by the State at my trial. However, I

have advised my attorneys that I do not desire them to put such evidence before the Court or the jury. I have expressly forbidden them to mention or present such evidence or argue such evidence during any part of the trial proceeding, including either the guilt or penalty phase.

(C. 4978.)

Although he was subpoenaed to testify at the hearing, Theodis did not testify. Acklin also did not testify at the hearing.

Acklin raises a number of claims related to this waiver and the decision of his trial counsel not to put on evidence of the alleged abuse.

. . .

First, Acklin argues that he "was denied his right to conflict-free counsel because his attorney (A) had divided loyalties due to the third-party payer arrangement, and (B) chose a course of action that helped the person paying him and harmed his client." (Acklin's brief, p. 13.)

. . .

Addressing a lawyer's conflict of interest as it relates to the Sixth Amendment right to effective counsel, this Court has explained:

> "[I]n order to establish a violation of the Sixth Amendment, . . . [a defendant] must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. [335] at 348, 100 S. Ct. [1708] at 1718 [(1980)]. *Accord Williams v. State*, 574 So. 2d 876, 878 (Ala. Crim. App. 1990). To prove that an actual conflict adversely affected his counsel's performance, a defendant must make a factual showing "that his counsel

actively represented conflicting interests,"
*Cuyler v. Sullivan*, 446 U.S. at 350, 100 S. Ct.
at 1719, "'and must demonstrate that the
attorney made a choice between possible
alternative courses of action, such as eliciting
(or failing to elicit) evidence helpful to one
client but harmful to the other.'" *Barham v.
United States*, 724 F.2d 1529, 1532 (11th Cir.)
(quoting *United States v. Mers*, 701 F.2d 1321,
1328 (11th Cir. 1983)), cert. denied, 467 U.S.
1230, 104 S. Ct. 2687, 81 L.Ed.2d 882 (1984).
Once a defendant makes a sufficient showing
of an actual conflict that adversely affected
counsel's performance, prejudice under
*Strickland v. Washington*, 466 U.S. 668, 104 S.
Ct. 2052, 80 L.Ed.2d 674 (1984)—i.e., "that,
but for counsel's unprofessional errors, the
result of the proceeding would have been
different"—is presumed. *Strickland*, 466
U.S. at 694, 692, 104 S. Ct. at 2068, 2067. *See
United States v. Winkle*, 722 F.2d 605, 610
(10th Cir. 1983); *Williams v. State*, 574 So. 2d
at 878.

*Jones v. State*, 937 So. 2d 96, 99–100 (Ala. Crim. App.
2005) (quoting *Wynn v. State*, 804 So. 2d 1122, 1132 (Ala.
Crim. App. 2000)). Additionally,

"[a]n actual conflict of interest occurs when
a defense attorney places himself in a
situation 'inherently conducive to divided
loyalties.'" *Castillo* [*v. Estelle*], 504 F.2d
[1243] at 1245 [ (5th Cir. 1974)]. If a defense
attorney owes duties to a party whose
interests are adverse to those of the
defendant, then an actual conflict exists. The
interests of the other client and the defendant
are sufficiently adverse if it is shown that the

> attorney owes a duty to the defendant to take some action that could be detrimental to his other client.

*Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979).

*Ervin v. State*, 184 So. 3d 1073, 1080–81 (Ala. Crim. App. 2015). *See also Smith v. State*, 745 So. 2d 922, 938 (Ala. Crim. App. 1999).

Acklin argues that Rahmati "had an actual conflict of interest because his loyalties were divided between his client and the person paying his fee." (Acklin's brief, p. 14.) In rejecting this conflict-of-interest claim, the circuit court stated:

> [ . . . ]

> Acklin also claims that a conflict of interest arose when his father threatened to stop making further payments to Mr. Rahmati and Mr. Gray if they presented evidence during the penalty phase of trial that Acklin's father was physically and emotionally abusive toward him and his family.

> Acklin's trial counsel questioned Acklin and his mother about his background, including whether Acklin had suffered any type of abuse. Initially, neither Acklin nor his mother disclosed that Acklin's father was verbally and physically abusive to Acklin and other family members. It was not until mere days before Acklin's trial that his mother disclosed to Mr. Rahmati that Acklin's father was physically and emotionally abusive. Acklin confirmed his mother's belated disclosure about his father's abusive behavior only when he was confronted by trial counsel. When Acklin was informed by his trial counsel that evidence he was abused by [his] father could be presented as a mitigating circumstance during the penalty phase, Acklin prevented them from presenting it.

In *Adkins v. State*, 930 So. 2d 524, 540 (Ala. Crim. App. 200[1]), the Alabama Court of Criminal Appeals held that "[u]ltimately the decision to waive the presentation of mitigating evidence was Adkins' decision. We refuse to find an attorney's performance ineffective for following his client's wishes." *See Schriro v. Landrigan*, 550 U.S. 465, 476–477 (2007) (holding that trial counsel was not ineffective during the penalty phase for failing to present certain potentially mitigating evidence where the defendant prohibited counsel from presenting said evidence).

Mr. Rahmati testified that when he confronted [Theodis] about domestic abuse and informed [him] it could be presented at the penalty phase that he "wasn't happy." According to Mr. Rahmati, Acklin's father told him that "[y]ou tell Nick if he wants to go down this road, I'm done with him" and left Mr. Rahmati's office. Acklin presented no evidence that his father threatened to not pay trial counsel if they presented evidence that he was abusive during the penalty phase. From the time Mr. Rahmati agreed to represent Acklin he knew it was unlikely [Velma] could pay the retainer fee. At the evidentiary hearing, Mr. Rahmati stated that "I suspected strongly we were never going to get paid from Day 1." This Court finds that Mr. Rahmati's and Mr. Gray's failure to present potential mitigating evidence regarding domestic abuse to the jury and trial judge was not because of a conflict of interest with Acklin's father—it was because Acklin made the conscious decision that he did not want this evidence presented at trial.

(C. 4004–08.) Acklin has not demonstrated that these findings by the circuit court are erroneous.

Acklin argues that Theodis's comment he was "done helping with this case" necessarily meant that Theodis would have stopped paying trial counsel. Even if that is true, however, the evidence supports

the circuit court's findings (1) that Rahmati and Gray did not expect to be paid the full retainer and (2) that the failure of the parents to pay the full retainer did not prejudice Acklin, particularly in light of the work Rahmati and Gray did on the case.FN9

> FN9 Acklin cites Rule 1.8(f), Ala. R. Prof'l Conduct, which states: "A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client consents after consultation" and "(2) there is no interference with the lawyer's independence of professional judgment." The evidence in this case, however, supports a finding that trial counsel did not violate Rule 1.8(f).

Furthermore, Rahmati's testimony that he told Theodis that he would "do whatever [he] need[ed] to, to get [Theodis] to this sentencing phase" was uncontradicted (R. 112), as was Rahmati's testimony that he told Acklin everything about his interaction with Theodis including that Theodis could be required to testify. In short, Acklin failed to prove that an actual conflict existed or that Rahmati had "divided loyalties" between Acklin and Theodis. The evidence supports the circuit court's finding that the sole reason for trial counsel's failure to introduce evidence of the alleged abuse was that Acklin expressly forbade them from doing so.

Moreover, as the circuit court noted, this Court and the United States Supreme Court have rejected claims alleging ineffective assistance of counsel regarding the failure to introduce mitigating evidence where the decision not to introduce that evidence was at the express direction of the accused. *See, e.g., Adkins v. State*, 930 So. 2d 524, 539–40 (Ala. Crim. App. 2001) ("We join the majority of

jurisdictions that have considered this issue and hold that a defendant is estopped from raising a claim of ineffective assistance of counsel for counsel's failure to present mitigating evidence when the defendant waived the presentation of mitigating evidence. To punish Adkins's attorneys for following his wishes would conflict with the doctrine of invited error. 'Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.' *Phillips v. State*, 527 So. 2d 154, 156 (Ala. 1988).""); *see also Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 167 L.Ed.2d 836 (2007).FN10 Here, there was uncontradicted evidence that counsel's decision not to introduce evidence of the abuse was at the express direction of Acklin.

> FN10 Both *Adkins* and *Schriro* involved a defendant's waiver of all mitigation evidence, and in both cases the trial court engaged the defendant in a colloquy regarding the decision to waive all mitigation evidence. Neither circumstance is present here: Acklin did present some evidence in mitigation, and the circuit court therefore did not have an opportunity to engage Acklin in a colloquy regarding the decision not to offer all mitigating evidence that was potentially available. . . .

Acklin has not demonstrated that the circuit court's findings regarding this claim were erroneous, and he is due no relief.

*Acklin*, 266 So. 3d at 101–09.

Because the state courts addressed Acklin's conflict of interest claim on the merits, Acklin must demonstrate not only that the claim is meritorious but also that

the ACCA's rejection of the claim was either an unreasonable determination of the facts in light of the evidence presented or was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1)-(2); *Boyd*, 592 F.3d at 1292. Acklin invokes both prongs of the § 2254(d) test.

Acklin first argues that the ACCA unreasonably applied clearly established federal law, including *Cuyler v. Sullivan*, 446 U.S. 335 (1980), in denying his conflict-of-interest claim. As noted above, the general rule from *Strickland* is that deficiencies in counsel's representation that have no effect upon the trial's outcome do not establish a constitutional violation. However, there is an exception to this rule: defendants need not show probable effect upon the outcome, i.e., "prejudice," and courts have "simply presumed such effect, where assistance of counsel has been denied entirely or during a critical stage of the proceeding." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). "When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." *Id.* The Supreme Court has in some cases held that when defense counsel has a conflict of interest, prejudice need not be shown. *Id.*

In *Sullivan*, the Supreme Court held that to establish a denial of the Sixth Amendment right to conflict-free counsel, a defendant must demonstrate that his

counsel "actively represented conflicting interests" and that the conflict "adversely affected his lawyer's performance." 446 U.S. at 350. The Court further held that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50. This is because "the conflict itself demonstrate[s] the denial of the 'right to have the effective assistance of counsel.'" *Id.* at 349 (quoting *Glasser v. United States*, 315 U.S. 60, 76 (1942)). In this way, the *Sullivan* test represents an exception to the general two-pronged ineffective-assistance-of-counsel standard of *Strickland*, in which a movant must not only show deficient performance but also that he was prejudiced. *See Schwab v. Crosby*, 451 F.3d 1308, 1322 (11th Cir. 2006) ("The allure of the *Sullivan* test for defendants is that adverse effect is much easier to show than the actual prejudice required when all that is involved is an attorney error.").

However, *Sullivan* involved an alleged conflict of interest arising from two retained defense lawyers representing three defendants accused of murder and tried separately. 446 U.S. at 337. The Supreme Court later explained, in dicta, that *Sullivan* does not extend to any situation other than that of multiple concurrent representation. *See Mickens*, 535 U.S. at 175 (stating that, although Courts of Appeals have applied *Sullivan* "unblinkingly to all kinds of alleged attorney ethical conflicts," including "when representation of the defendant somehow implicates counsel's

personal or financial interests," the "language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application" (internal quotation marks omitted)); *see also Schwab*, 451 F.3d at 13267 ("there is no Supreme Court decision holding that any kind of presumed prejudice rule applies outside the multiple representation context. The *Sullivan* decision itself did not involve any other context."). As such, the Eleventh Circuit has held in several cases that a habeas petitioner cannot rely upon *Sullivan* as clearly established federal law for § 2254(d) purpose if the conflict of interest claim does not involve multiple concurrent representation. *See Downs v. Sec'y, Fla. Dep't of Corrs.*, 738 F.3d 240, 265 (11th Cir. 2013) ("Because it was far from clearly established that *Sullivan* applied to Downs's contingency fee claim, the Florida Supreme Court's decision denying that claim could not have been 'contrary to, or involved an unreasonable application of,' *Sullivan.*") (quoting 28 U.S.C. § 2254(d)(1)); *Schwab*, 451 F.3d at 1328 (failure to extend *Sullivan* to cases not involving concurrent multiple representations is not unreasonable under § 2254(d)(1)). Indeed, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). In other words, because Acklin merely alleges that his counsel had a financial conflict of interest due to a third party paying

his legal fees, *Sullivan* is not clearly established federal law applicable to Acklin's conflict of interest claim, so the ACCA could not have erred in applying it.

Aside from *Sullivan*, Acklin cites four other Supreme Court cases as support for his claim that the ACCA unreasonably applied clearly established federal law in its opinion: *Glasser v. United States*, *Holloway v. Arkansas*, *Mickens v. Taylor*, and *Wood v. Georgia*. However, the first three each addressed conflicts of interest in the multiple representation context. In *Glasser*, two of the five codefendants in a joint trial for conspiracy were represented by the same attorney. Because of that "struggle to serve two masters," counsel failed to cross examine a key witness and failed to object to the admission of certain evidence. 315 U.S. at 75. The conflict arose from the dual representation. *Holloway v. Arkansas* likewise involved the representation of codefendants. The Supreme Court held that the joint representation of multiple clients with conflicting interests is inherently suspect. 435 U.S. 475, 489–90 (1978). In *Mickens v. Taylor*, the attorney representing Mickens in his trial for murder had also been representing the victim at the time of his murder. 535 U.S. at 174. The alleged conflict arose from the successive representation of multiple clients. The "case was presented and argued on the assumption that . . . *Sullivan* would be applicable." *Id.* Because of that procedural posture, the Supreme Court decided the case without actually ruling "upon the need for the *Sullivan* prophylaxis in cases of

successive representation." *Id.* at 176. The Court stated that whether *Sullivan* applies beyond multiple concurrent representation cases remains "an open question." *Id.* Indeed, the Supreme Court explicitly referenced cases in which "representation of the defendant somehow implicates counsel's personal or financial interests" and determined that "the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." *Id.* at 174–75. Third party payer arrangements like the one here fit that description.

Acklin staunchly maintains that *Wood v. Georgia* stands for the proposition that *Sullivan* extends to third party payer situations. *Wood* concerned three indigent defendants who were represented by the lawyer for their employer. 450 U.S. 261, 271 (1981). The Court recognized a potential conflict in that the employer wanted to establish a legal precedent while the employees wanted to avoid jail time. *Id.* at 263–69. Referencing *Cuyler*, the *Wood* Court discussed the inherent dangers that adhere to "particular third-party fee arrangement[s]," namely when an attorney represents both an employer and its employees. *Id.* at 270. The Court ultimately remanded the case for further proceedings on the conflict issue. *Id.* at 268–69. There is no reason to believe that the *Wood* Court would have found other third-party payer arrangements inherently suspect, such as when parents pay the legal fees for their children, a fairly common occurrence.

Even if *Sullivan*'s test applies in the third party payer context, Acklin's claim still fails. Applying the first prong of *Sullivan*'s test, Acklin contends that the ACCA unreasonably determined the facts in light of the record when it held that he failed to prove that Rahmati suffered from an actual conflict of interest. According to Acklin, Rahmati had conflicting interests the moment his father made it clear that he would stop paying Acklin's legal fees if Rahmati introduced evidence of his abuse of Acklin as a child. Undermining Acklin's argument, however, is the fact that *Theodis never unambiguously issued such a threat.* Rahmati recounted during his evidentiary hearing testimony that when he confronted Theodis with the allegations of abuse, Theodis said something like, "You tell Nick if he wants to go down this road, I'm done with him" and "I'm done helping with this case." Nothing in the record compels the conclusion that Theodis's remarks to Rahmati constituted a threat to withhold payment. Indeed, Theodis never testified that he meant his statements to be a threat to withhold payment, and neither Rahmati nor Acklin ever testified that they understood the comments in that manner. Read in context of the full testimony, Theodis's remarks have a number of plausible interpretations that have nothing to do with financial support—e.g., that he would withdraw emotional or moral support for Acklin, that he would avoid seeing or speaking with Acklin again, or that he would no longer voluntarily make the plea for mercy that he ultimately made before the trial

court at the judicial sentencing phase. Accordingly, it was not unreasonable that the circuit court and ACCA, after considering all of Rahmati's testimony, to not construe the statements as an unequivocal threat to withhold payment. And even if Theodis's statements could be interpreted as a threat to withhold payment, this Court should not "substitute its reading of ambiguous language for that of the trial court." *United States v. Robinson*, 485 U.S. 25, 31 (1988). When there are "two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Conner v. GDCP Warden*, 784 F.3d 752, 766 (11th Cir. 2015) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). *See also Ward*, 592 F.3d at 1155–56 (a habeas petitioner must rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence). Ultimately, it was Acklin's burden to prove that the threat was financial, directed at Rahmati, and created a conflict, but he failed to do so. The circuit court and ACCA's interpretation was reasonable and certainly not entirely devoid of support in the record.

Without proof of an actual conflict of interest, Acklin's *Sullivan* claim fails. But Acklin has similarly not proven that Rahmati's purported conflict adversely affected the adequacy of his representation, as required by the second prong of *Sullivan*. *See* 446 U.S. at 349. Ample evidence in the record supports the state

courts' determination that Rahmati's representation was not adversely affected. Namely, despite "suspect[ing] strongly [that they] were never going to get paid from Day 1," Vol. 40, Tab #R-90, at R. 56, and receiving only $5,025 in total payments over the more than two years that they worked for Acklin, Rahmati and Gray spent more than 400 hours preparing for his defense, Vol. 36, Tab #R-89, at C. 4241–54, at a rate of approximately $12.50 an hour. As Rahmati testified, "[W]e did everything we absolutely, positively could do, and then some." Vol. 40, Tab #R-90, at R. 160. "From the beginning," that preparation included work on a mitigation strategy for a potential sentencing phase of trial. *Id.* at R. 92. Although counsel investigated "whether there had been any abuse in the family," *id.* at R. 163, neither Acklin nor his mother, Velma Evans, disclosed the history of abuse until two days before trial. *See id.* at R. 109, 162–63; *see also* Vol. 35, Tab #R-85, at C. 4007; *Acklin*, 266 So. 3d at 102, 115. Based on an abundance of uncontradicted evidence in the record, the circuit court reasonably found that counsel had been diligent in preparing for Acklin's trial and that they never expected to be paid the full retainer. Accordingly, even if Theodis's remarks could be construed as withholding further payments, such a threat would not have adversely affected Rahmati's representation going forward.

Acklin also argues that it was unreasonable for the ACCA to have found that Rahmati's decision not to introduce evidence of Theodis's abuse during the penalty phase was not due to any supposed threat by Theodis or financial conflict of interest but was instead "at the express direction of Acklin." *Acklin*, 266 So. 3d at 109. However, this conclusion is strongly supported by the record. Once the history of abuse was disclosed, Rahmati immediately confronted Theodis and asked him to consider testifying about the abuse. *See* Vol. 40, Tab #R-90, at R. 110–11. Theodis then made his alleged threat to withdraw financial support, to which Rahmati responded, "Mr. Acklin, I will do whatever I need to, to get you to this sentencing phase." *Id.* at R. 112. Rahmati's response suggests either that he did not think Theodis had threatened to withhold funds (meaning no actual financial conflict existed) or that the threat did not affect Rahmati's independent judgment (meaning there was no adverse effect).

Following the confrontation, Rahmati visited Acklin in jail to confirm the account of the abuse and advise Acklin that the evidence could be used as significant mitigation. *Id.* at R. 164. Rahmati consulted with Acklin for two hours, recounting "everything about his interaction with Theodis including that Theodis could be required to testify." *Acklin*, 266 So. 3d at 108. Yet, Acklin "specifically stated he did not want [Rahmati] to introduce that evidence." Vol. 40, Tab #R-90, at R. 164.

Acklin said, "That didn't cause me to be here. I don't want to ruin their lives or have anything like this to come out on them." *Id.* The circuit court found that "Acklin specifically prevented his trial counsel from presenting evidence concerning his abuse as a child to the jury or the trial judge." Vol. 35, Tab #R-85, at C. 4030. The ACCA agreed "that the sole reason for trial counsel's failure to introduce evidence of the alleged abuse was that Acklin expressly forbade them from doing so." *Acklin*, 266 So. 3d at 108.

Acklin argues that the waiver did not eliminate Rahmati's conflict of interest because the waiver was tainted by the conflict. However, the uncontradicted testimony was that because Rahmati "felt so strong about the need to try to introduce" the sensitive evidence of abuse, he also "felt the need to memorialize" Acklin's contrary instructions in writing. Vol. 40, Tab #R-90, at R. 165. Acklin was thus presented with a typed statement that set forth how Rahmati and Gray had advised him that evidence of his father's abusive conduct could be considered in mitigation. Acklin has never alleged that he was pressured or induced into signing the waiver. Acklin never took the stand to dispute that the sole reason Rahmati failed to introduce evidence of the abuse was because Acklin forbade him from doing so. Nor did anyone else challenge Rahmati's account. Essentially, Acklin produced no evidence that Rahmati's independent judgment was affected by Theodis's

purported threat to withdraw financial support. Further, Acklin's argument is belied by Supreme Court precedent indicating that certain fundamental decisions are reserved for a defendant, regardless of any actions or omissions by counsel and regardless of the subjective knowledge or understanding of the defendant. *See, e.g., McCoy v. Louisiana*, 138 S. Ct. 1500, 1507 (2018) ("As this Court explained, the right to defend is personal, and a defendant's choice in exercising that right must be honored out of that respect for the individual which is the lifeblood of the law."); *Landrigan*, 550 U.S. at 479 ("We have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence.").

Accordingly, the ACCA did not unreasonably determine the facts when it held that not only did Acklin not prove that Rahmati suffered from an actual conflict of interest but that Rahmati's performance as Acklin's counsel was not adversely affected by any such conflict.[3]

---

[3]    Acklin argues that, although prejudice is presumed under *Sullivan*, he has nonetheless demonstrated prejudice resulting from Rahmati's conduct. Respondent responds that, since Acklin did not demonstrate that Rahmati suffered an actual conflict of interest that adversely affected his performance, then Acklin must prove both elements of the general ineffective assistance of counsel claim under *Strickland*, including prejudice. Regardless, Acklin's prejudice argument is based on Theodis's testimony at the sentencing phase as well as the trial court's sentencing order, and, for organizational purposes, the prejudice analysis will be addressed in the following section regarding Acklin's claim that, even if Rahmati did not have a conflict of interest, Acklin still received ineffective assistance of counsel under *Strickland*.

In sum, because the state courts considered this conflict of interest claim on the merits, and has not established that the state courts' determination of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that the state courts' determination of this issue "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," 28 U.S.C. § 2254(d)(1)-(d)(2), federal habeas relief is foreclosed on this claim.

## B.     Acklin's claim that he was denied effective assistance of trial counsel in violation of the Sixth Amendment

Acklin's next claim is that even if Rahmati did not have a conflict of interest, he was ineffective under *Strickland* for three reasons: (1) he presented evidence at sentencing about Acklin's childhood that he knew was misleading and harmful; (2) he failed to conduct an adequate mitigation investigation; and (3) he failed to inform the court that the jail was medicating Acklin with Xanax during trial, which muted his emotional response in court. Each subclaim is addressed in turn.

### 1.     *Misleading Testimony*

Acklin's first subclaim is that, even assuming the waiver of abuse evidence that he signed was valid, his trial counsel nonetheless performed deficiently by presenting testimony about Acklin's childhood that he knew was misleading. In

support, Acklin points to the testimony that Rahmati elicited from Theodis at the sentencing phase concerning Acklin's upbringing. Theodis testified at the sentencing phase:

> I had to look back over my life and ask, where did I go wrong? Nicholas was raised in a God-fearing home. His mother, Velma, and I took him to church, he sang in the youth choir, he ushered. He was a good kid and I guess with me being a father who really, I guess overly protective, really a father who loves his children. Nick and I had a relationship, parent-teacher conferences, I took him to the dentist, I took him because that is the relationship I wanted with my son because I was denied that relationship with my father.

T.R. at 967. Additionally, Theodis testified:

> Because I am an overly protective parent, concerned about the African American youth and the directions that they are going, I wanted to be a good father. I wanted to protect my children, I wanted all of my children to be productive God-fearing, having families of their own. That was my whole dream for all six of my boys.

T.R. at 965. Rahmati also asked Theodis whether he ever had to discipline Acklin. T.R. at 968–69. Theodis replied, "We didn't have that problem." T.R. at 969. He described Nicholas as "easily disciplined." T.R. at 965.

At the judicial sentencing hearing, Theodis made a plea for mercy before the trial judge. He reiterated that Acklin was "raised in a Christian home, Protestant ethics, hard work, good values, to love and respect others," but "[s]omehow he slipped . . . ." Vol. 10, Tab R-36, TR. at 1026.

Acklin contends that the misleading testimony prejudiced him because the

trial court relied upon it in its sentencing order, as follows:

> This Court was impressed with the sincerity of the testimony by the
> defendant's mother and father. They are clearly good people and tried
> to do the right thing in raising him. However, the Court does not find
> this to be a mitigating circumstance. Most killers are typically the
> products of poverty, a dysfunctional family, physical or sexual abuse
> and/or social deprivation. Acklin was the product of a loving
> middleclass family. Acklin was exposed to all of the values that are
> central to an ordered society; however, he chose to reject them.

Vol. 2, Tab #R-2, C. 294; *see also* Vol. 10, Tab #R-36, TR. 1044. When asked about

the trial court's characterization of Acklin's upbringing in its sentencing order,

Rahmati testified at the Rule 32 evidentiary hearing: "I really couldn't [agree with

the trial court's statement], based on what I knew." Vol. 40, Tab #R-90, TR. at 151.

Acklin raised this claim in his Rule 32 proceedings, and the ACCA affirmed

the circuit court's denial of relief, writing as follows:

> Acklin argues that his trial "counsel knowingly presented
> misleading testimony that was harmful to his client and helpful to the
> person paying him, which establishes that his divided loyalties
> adversely affected his representation." (Acklin's brief, p. 17.) In
> Acklin's rendering,
>
> > [w]ithin [36] hours of Theodis's statement that he would
> > not support the case if Rahmati presented evidence of
> > abuse, Rahmati had Acklin sign a typed document stating
> > that he did not want evidence of abuse presented.
> > Although the waiver itself is problematic, it is not
> > necessary for this Court to address the waiver. Even
> > assuming that the waiver was valid, Rahmati did not

simply omit evidence that Theodis had abused Acklin; instead, he presented evidence suggesting the opposite: that Theodis was a supportive father and Acklin had a positive upbringing.

Rahmati knew Theodis would not be candid about the abuse, yet he affirmatively asked questions that would enable Theodis to mislead the jury and the court.

(Acklin's brief, pp. 18–19.)

At the outset, we reiterate our holdings in Part I.A.—first, Acklin failed to prove that Rahmati's loyalties were divided between Acklin and Theodis and, second, Rahmati's failure to introduce evidence of the abuse was at Acklin's express direction.

In denying this claim, the Rule 32 court did not directly address whether Theodis's testimony was misleading at the penalty phase or the sentencing hearing. The court noted:

This Court has reviewed penalty phase testimony presented by Mr. Rahmati and Mr. Gray. Most of this testimony concerned Acklin's character and personality. Acklin specifically prevented his trial counsel from presenting evidence concerning his abuse as a child to the jury or the trial judge.

(C. 4030.) The circuit court then found that Acklin failed to prove that he was prejudiced by the testimony given during the penalty phase or by Theodis's statements at the sentencing hearing. The court also held that Acklin did not prove that the introduction of evidence of the alleged abuse would have had any impact on the outcome of the penalty phase or the sentencing hearing. On appeal, Acklin has not demonstrated that those findings are erroneous.

As to Acklin's claim on appeal that Rahmati affirmatively elicited testimony from Theodis that Rahmati "knew" was "false," the record does not support that conclusion. At the penalty phase, Theodis's

51

testimony consisted of seven pages. (Trial R. 964–70.) After asking Theodis to state his name for the record and whether Theodis was Acklin's father, Rahmati asked Theodis nine questions. Acklin's characterization of those questions as "enabl[ing] Theodis to mislead the jury and the court" is inaccurate. Illustrative of Acklin's mischaracterization of those questions is his description of the question— "Q. Let me ask you this, did you ever see Nick to be disrespectful to anyone and if so, did you ever discipline him for anything?" Acklin suggests that Theodis's response to this question— i.e., "We didn't have that problem" and Acklin "was easily disciplined"—was false in light of the allegations of abuse. Acklin also asserts that Theodis's additional comments in response to that question—e.g., that Theodis was an "overly protective [parent], really a father who loves his children"—were false in light of the allegations of abuse.

Contrary to Acklin's assertions, Rahmati's question about discipline may fairly be seen as an attempt to elicit Theodis's assessment of Acklin's character—not as an affirmative attempt to get Theodis to mislead the court and the jury as to whether Theodis himself was a "good" parent. As to whether Rahmati had an obligation to inform the court as to parts of Theodis's testimony that he thought might be untrue, Acklin has not demonstrated either (1) that Rahmati thought the testimony was "untrue" or (2) that Rahmati had an obligation to inform the court of his thoughts about the veracity of that testimony.

As to what occurred at the sentencing hearing, we note that Acklin mischaracterizes Theodis's participation at that hearing. The statements made by Theodis at that hearing before the sentencing judge followed this statement from Rahmati: "This is not going to be testimony and I am not going to ask [Theodis] Acklin questions. As my client's father, he simply has something that he would like to tell the Court." (Trial R. 1025.)

Acklin directs this Court to that part of the sentencing order, also quoted above, in which the sentencing court stated:

The Court was impressed with the sincerity of the testimony by the defendant's mother and father. They are clearly good people and tried to do the right thing in raising him. However, the Court does not find this to be a mitigating circumstance. Most killers are typically the products of poverty, a dysfunctional family, physical or sexual abuse and/or social deprivation. Acklin was the product of a loving middle-class family. Acklin was exposed to all of the values that are central to an ordered society; however, he chose to reject them. Acklin made a conscious choice to become a killer; he was not born to it.

(Trial C. 294.) According to Acklin, Rahmati knew that the trial court's statements here were incorrect, and, Acklin says, Rahmati should have objected to them or at least brought the trial court's attention to them.

The Rule 32 court rejected this argument, however—finding, again, that the responsibility for Rahmati's failure to tell the sentencing court about the abuse is because Acklin had expressly prohibited Rahmati from doing so. The circuit court noted, again, that a "defendant cannot intentionally prevent his trial counsel from presenting evidence during trial and then, years later, attempt to profit from trial counsel's failure" to present that evidence. *See Adkins v. State*, 930 So. 2d at 539–40; *see also Gilreath v. Head*, 234 F.3d 547, 550 n.10 (11th Cir. 2000) ("We readily conclude that trial counsel—by relying on Petitioner's instruction not to present mitigating mental health and alcohol abuse evidence—did not perform in an unreasonable manner."). We agree with the circuit court.

Acklin's refusal to permit Rahmati to introduce evidence of the abuse left trial counsel with the task of presenting a mitigation case without the ability to present evidence of the abuse. Trial counsel chose a strategy of presenting evidence of Acklin's pleasant disposition and his remorse over the murders. That strategy included attempting to portray Acklin and his family "in the best light [they] possibly could for both Judge Smith and for the jury." (R. 151.) Counsel presented testimony from eight witnesses, including Acklin's parents, his aunt,

his grandmother, a retired police officer, an employee at a youth organization, and two reverends.

As noted above, we do not agree with Acklin's characterization of Rahmati's efforts during the penalty phase and the sentencing phase. Acklin has not shown that Rahmati intentionally elicited false evidence or failed to draw the court's attention to evidence Rahmati knew to be false. Although Rahmati knew about the allegations of abuse, he had also been told by Velma that the alleged abuse was most intense during the year before Velma and Theodis divorced—which occurred when Acklin was 11 (he was 24 at the time of the crimes). At the time of the trial, Theodis had remarried and had been a reverend for some time. There was testimony that Acklin had regularly attended church and had participated in the youth choir at his church. Theodis had paid some of Acklin's legal bills, and he made an impassioned plea for mercy to the jury and to the trial court. Thus, even if Rahmati believed that the allegations about the abuse were accurate, Theodis's comments about loving his children and raising them in a "Christian" home were not necessarily untrue.

Nor do we agree with Acklin's suggestion that, if the jury or the trial court had known about the abuse—or at least had not heard some evidence that Acklin was raised in a "loving middle-class family"—the outcome might have been different. The sentencing court did not expressly rely on Acklin's home environment as a basis for imposing the death sentence—rather, the court rejected his home environment as a mitigating circumstance. FN14

> FN 14 Had the evidence been as Acklin now argues it should have been—that his home environment had been bad and that he endured horrific abuse at the hands of his father—this Court has often noted that whether such evidence is mitigating "may be in the eye of the beholder." *Davis v. State*, 44

So. 3d 1118, 1141 (Ala. Crim.
App. 2009).

After hearing much of the evidence that Acklin argues should have been introduced, the Rule 32 court found:

> While Acklin presented evidence his father was abusive to him, his mother and siblings, he completely failed to prove why his exposure to abuse would have been considered a mitigating factor by the jury and the trial court. This is especially true given Acklin's age at the time of the offenses. The abuse Acklin endured at the hands of his father clearly had no effect on Acklin's ability to work, maintain relationships, or to function in society to conform his behavior to the requirements of the law if he chose to do so. *See Mills v. Singletary*, 63 F.3d 999, 1025 (11th Cir. 1995) ("[E]vidence of Mills' childhood environment likely would have carried little weight in the light of the fact that Mills was twenty-six when he committed the crime."); *see also Tompkins v. Moore*, 193 F.3d 1327, 1337 (11th Cir. 1999) (holding that "where there are significant aggravating circumstances and the petitioner was not young at the time of the capital offense, 'evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight'") (citation omitted).

(C. 4032.)

In sum, Acklin has not demonstrated any reasonable probability that evidence of the alleged abuse would have altered the trial court's weighing of the aggravating and mitigating circumstances, particularly in light of the "savage brutality of these murders" and the sentencing court's determination "that each of the two aggravating circumstances, even standing alone, outweigh all the mitigating circumstances." (Trial C. 295.) *Cf. Kansas v. Carr*, 577 U.S. ----, 136 S. Ct. 633, 646, 193 L. Ed. 2d 535 (2016) (stating, in rejecting a claim that certain acts or evidence had rendered a sentencing proceeding fundamentally unfair: "None of that mattered. What these defendants did—acts of almost

inconceivable cruelty and depravity—was described in excruciating detail [by one of the victims who had survived].''). Acklin also has not demonstrated that his trial counsel knowingly presented false testimony due to a conflict of interest.

The circuit court properly denied this claim, and Acklin is due no relief.

. . .

Acklin next argues that his "counsel's deficient performance prejudiced" him. (Acklin's brief, p. 37.) Acklin again cites (1) the sentencing court's alleged "misunderstanding of the facts" regarding Acklin's childhood and (2) the sentencing order's statements about Acklin's "demeanor."

We have already held that counsel did not perform deficiently as to either of those aspects of the sentencing court's order. Acklin expressly prohibited his counsel from introducing evidence of the alleged abuse in his childhood, and counsel did not mislead the court or have an obligation to ignore Acklin's instructions and tell the court about the allegations of abuse. . . . Accordingly, a discussion of whether counsel's representation prejudiced Acklin is unnecessary.

Regardless, Acklin has not demonstrated that counsel's allegedly deficient performance prejudiced him. First, Acklin's statement that "the two main factors the trial court weighed against Acklin were his positive upbringing and his unemotional demeanor in court" is incorrect. The sentencing order is clear that the two main factors the court weighed against Acklin were the two aggravating circumstances—which, the sentencing court said, would have each independently outweighed the mitigating circumstances. Furthermore, as the State notes in its brief, the sentencing court made clear that "[t]he vicious ruthlessness of the murders was more than sufficient" to justify the sentence of death. (State's brief, p. 59.)

As to the alleged prejudice suffered by not introducing evidence of Acklin's abuse as a child, Acklin's reliance on cases such as *Wiggins,*

*supra, State v. Gamble*, 63 So. 3d 707 (Ala. Crim. App. 2010), and *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008), is misplaced. Unlike counsel in those cases, Acklin's counsel learned about the alleged abuse and was willing to introduce evidence of it. Also, unlike the defendants in those cases, Acklin expressly prohibited his counsel from introducing the evidence.

*Acklin*, 266 So. 3d at 109–13, 116.

Acklin argues that the ACCA's decision involved an unreasonable application of clearly established federal law, including *Strickland*, *see* 28 U.S.C. § 2254(d)(1), and was based on an unreasonable determination of the facts in light of the evidence in the record, *see* 28 U.S.C. § 2254(d)(2), when it held that Acklin failed to prove (1) Rahmati elicited false testimony from Theodis, (2) Rahmati had any obligation to inform the court about the allegations of abuse, or (3) Rahmati's allegedly deficient performance prejudiced Acklin.

First, although counsel has a duty under *Strickland* to refrain from presenting evidence that he knows is false or misleading, *see Nix v. Whiteside*, 475 U.S. 157, 171 (1986) ("[U]nder no circumstance may a lawyer either advocate or passively tolerate . . . false testimony."), the ACCA's conclusion that Rahmati did not elicit "false" testimony from Theodis was not so lacking in justification as to give rise to error beyond any possibility for fairminded disagreement. *See Harrington*, 562 U.S. at 103. As noted by the ACCA, Theodis's comments about loving his children and raising them in a Christian home were not necessarily untrue, even if there had been a

history of abuse at some point in Acklin's childhood as well. Additionally, Rahmati's question to Theodis about disciplining Acklin could be fairly seen to be an attempt to elicit Theodis's assessment of Acklin's good character and was not necessarily a misrepresentation that Theodis was a "good" parent.

Second, the ACCA was not unreasonable in holding that Acklin failed to prove that Rahmati had an obligation to inform the court about the allegations of abuse. As an initial matter, Acklin did not prove that the testimony was untrue, as discussed above. Further, if Rahmati had so informed the court, he would have contravened Acklin's instruction in his waiver that he was prohibited from discussing any abuse evidence at all. *See McCoy*, 138 S. Ct. at 1508, 1511 (a defendant has a right to control his own defense).

Third, the ACCA correctly found that Acklin failed to prove prejudice. As an initial matter, Acklin misrepresents the trial court's sentencing order as expressly relying on his home environment as a basis for imposing the death sentence. To the contrary, and as the ACCA found, the trial court simply rejected his home environment as a mitigating circumstance. The trial court discussed the home environment in a section of the sentencing order dedicated to mitigating circumstances and did "not find this to be a mitigating circumstance." Vol. 2, Tab #R-2, at C. 294. The trial court did *not* mention the home environment in the

aggravating factors section or in the weighing section of the sentencing order. Acklin's claim that the trial court thought his home environment made him "more deserving of death than most capital defendants" is not supported by the record.

Acklin also claims that the ACCA improperly relied on a finding that the abuse evidence would not have been powerful due in part to the fact that Acklin was 24 years old at the time of the offense. However, in doing so, the court explicitly relied on Eleventh Circuit case law holding similarly. *See Acklin*, 266 So. 3d at 112 (citing *Tompkins*, 193 F.3d 1327, 1337 (11th Cir. 1999); *Mills*, 63 F.3d 999, 1025 (11th Cir. 1995)). In support of this argument, Acklin relies upon *Porter v. McCollum*, 558 U.S. 30 (2009), in which a Florida petitioner alleged that his trial counsel was ineffective for failing to present available mitigating evidence, including evidence that the petitioner was abused as a child. The state post-conviction court "discounted the evidence of Porter's abusive childhood because he was 54 years old at the time of the trial," *id*. at 37, which was held soon after the offense. The Supreme Court reversed, holding that it was "unreasonable [for the state court] to discount to irrelevance the evidence of Porter's abusive childhood." *Id*. at 43. Acklin contends that if it was unreasonable for the Florida court to discount the defendant's childhood because he was 54, then it was unreasonable for the ACCA to discount Acklin's childhood because he was 24. However, *Porter* is distinguishable. The ACCA did not "discount

to irrelevance" the evidence of Acklin's abusive childhood. Rather, the court carefully explained why the evidence likely would have been given little weight. *See Acklin*, 266 So. 3d at 111–12 ("[T]he alleged abuse was most intense during the year before Velma and Theodis divorced—which occurred when Acklin was 11 (he was 24 at the time of the crimes). . . . The abuse Acklin endured at the hands of his father clearly had no effect on Acklin's ability to work, maintain relationships, or to function in society to conform his behavior to the requirements of the law if he chose to do so."). Additionally, in *Porter*, the evidence of abuse was far more significant, and the Florida Supreme Court's discussion of abuse and prejudice was essentially nonexistent.

Acklin also relies upon several other Supreme Court cases for various points that the Court must address. He cites *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005), for the proposition that courts frequently find that the omission of childhood abuse mitigation in capital cases is prejudicial. However, the evidence of abuse in those cases was far more significant than that which was allegedly present here. In *Rompilla* particularly, defense lawyers failed to examine a file on Rompilla's prior conviction for use in mitigation. The Supreme Court discussed what the file would have shown, as follows:

> If the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of

mitigation leads that no other source had opened up. In the same file with the transcript of the prior trial were the records of Rompilla's imprisonment on the earlier conviction, App. 508, 571, 631, which defense counsel testified she had never seen, *id.*, at 508. The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was "reared in the slum environment of Allentown, Pa. vicinity. He early came to [the] attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out Penna. often of assaultive nature and commonly related to over-indulgence in alcoholic beverages." Lodging 40. The same file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling. *Id.*, at 32–35.

The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts. With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case. Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview. Judge Sloviter summarized this evidence:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children

lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags. . . .

The jury never heard any of this and neither did the mental health experts who examined Rompilla before trial. While they found "nothing helpful to [Rompilla's] case," *Rompilla*, 554 Pa., at 385, 721 A.2d, at 790, their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of "'red flags'" pointing up a need to test further. 355 F.3d, at 279 (Sloviter, J., dissenting). When they tested, they found that Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions." "Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense."

These findings in turn would probably have prompted a look at school and juvenile records, all of them easy to get, showing, for example, that when Rompilla was 16 his mother "was missing from home frequently for a period of one or several weeks at a time." Lodging 44. The same report noted that his mother "has been reported . . . frequently under the influence of alcoholic beverages, with the result that the children have always been poorly kept and on the filthy side which was also the condition of the home at all times." *Ibid*. School records showed Rompilla's IQ was in the mentally retarded range. *Id.*, at 11, 13, 15.

545 U.S. at 390–91. *See also Wiggins*, 539 U.S. at 534–35 (noting "powerful" abuse evidence including that Wiggins "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother, . . . suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care, . . . spent [time] homeless, [and had] diminished mental capacities"). This case is not *Wiggins* or *Rompilla.*

Acklin also relies upon *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008), in which the Eleventh Circuit granted sentencing relief because the "evidence introduced in the Rule 32 proceedings contradicted factors expressly relied upon by the trial judge as grounds for imposing the death penalty." *Id*. at 1342. However, as the ACCA noted, *Williams* is distinguishable in that here, Rahmati learned about the evidence of the abuse and was willing to disclose it, but he was expressly prohibited from doing so by Acklin.

Finally, Acklin relies upon *Cooper v. Secretary, Department of Corrections*, 646 F.3d 1328 (11th Cir. 2011), and *Johnson v. Secretary, Department of Corrections*, 643 F.3d 907 (11th Cir. 2011), in claiming that it was unreasonable for the state courts to have held that he cannot show prejudice due to the seriousness of his crime. Although the Eleventh Circuit found in those cases that, despite the egregious nature of the capital offenses, counsel's failure to investigate and present certain mitigation

evidence was nonetheless prejudicial to the defendants, the omitted evidence here is simply not as powerful as that in *Cooper* and *Johnson. See Cooper*, 646 F.3d at 1354-55 (the unpresented mitigating evidence would have supported a finding that Cooper was entitled to the statutory mitigators of age at the time of the crime and substantial domination). In *Johnson*, trial counsel brought forward evidence that the petitioner's parents were "cold and uncaring, something in the nature of the 'American Gothic' couple." 643 F.3d at 936. The jury heard testimony from four witnesses that the defendant's father had been a "weekend drinker," that his mother would also drink, that the defendant spent several months in an orphanage, that he was an alcoholic, and that his mother and brother died before his arrest for capital murder. *Id.* at 912-13. In fact, as revealed at the habeas evidentiary hearing, they were raging alcoholics; the petitioner was put into an orphanage when his father went on a three-month drinking binge in another state; the petitioner's mother attacked his father with a butcher's knife; and the petitioner was singled out for particularly severe beatings. *Id.* at 936-37. The jury never heard anything about the petitioner's mother's repeated suicide attempts—one of them discovered by the petitioner when he was a child. *Id.* It did not know anything about how the petitioner later found his mother, dead of an overdose, clutching a photograph of his dead brother, who also died of an overdose. *Id.* at 937. The jury also heard that the petitioner's grandparents "were caring and

nurturing people," whereas later-introduced habeas evidence showed them to have inflicted horrifying physical, emotional, and psychological abuse on the petitioner. *Id.*

In sum, Acklin has not demonstrated the there is any reason to overturn the ACCA's reasonable conclusion that he did not establish his ineffective assistance of counsel claim premised on Rahmati presenting misleading testimony.

### 2. *Failure to Conduct an Adequate Mitigation Investigation*

Acklin next contends that, aside from suffering from a conflict of interest and offering misleading testimony, his trial counsel did not conduct an adequate mitigation investigation, and due to this failure, the waiver that Acklin signed regarding the abuse evidence could not have been knowing and intelligent and thus without legal effect.

Acklin raised this claim for the first time during his Rule 32 proceedings, and the ACCA's conclusion that Acklin did not prove deficient performance is as follows:

> Acklin argues next that his trial "counsel conducted an inadequate investigation such that Acklin could not possibly make a knowing and intelligent waiver of the abuse evidence." (Acklin's brief, p. 29.) Acklin cites decisions such as *Whitehead v. State*, 955 So. 2d 448, 460 (Ala. Crim. App. 2006) ("'[I]f counsel failed to investigate and advise, then Petitioner's waiver was not knowing and intelligent and thus without legal effect.' *Holloway* [*v. Horn*], 161 F. Supp. 2d [452,] 569 [(E.D. Pa. 2001)] (emphasis added), rev'd on other grounds, 355 F.

3d 707 (3d Cir. 2004)."), and *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

Those decisions are not controlling on the question presented here. *Whitehead* involved a petitioner who had allegedly waived the right to present any mitigation evidence. 955 So. 2d at 454. Further, the record in *Whitehead* did not disclose that counsel had performed any investigation for the penalty phase. Under the circumstances there, this Court appears to have held that a purported waiver of the right to present any mitigation evidence would not automatically foreclose a subsequent challenge to the adequacy of counsel's investigation and preparation for the penalty and sentencing phases of a capital-murder trial.

In the instant case, Acklin did not waive a mitigation presentation; rather, he prohibited his attorneys from introducing evidence during their mitigation presentation of alleged abuse. Further, as recounted above in Part I, counsel in fact prepared for the penalty phase. Thus, *Whitehead* is inapposite.

Additionally, *Whitehead* was based extensively on the United States Supreme Court's decisions in *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), and *Wiggins, supra*. *Rompilla* and *Wiggins* addressed claims of ineffective assistance of counsel related to the adequacy of counsel's penalty-phase investigation. Our 2006 *Whitehead* decision quoted extensively from *Rompilla* but failed to apply the decision in a significant manner. We did say, however, that "an examination of the investigation counsel conducted is critical to determining the validity of the waiver and the effectiveness of counsel's performance in relation thereto." 955 So. 2d at 470.

Subsequent to *Whitehead*, the United States Supreme Court in *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007), clarified that it has "never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." 550 U.S. at 479, 127 S. Ct. 1933. Thus, Acklin has not demonstrated that he is entitled to relief on his claim that he was not knowing and informed

when he signed the statement prohibiting his attorneys from introducing evidence of the alleged abuse.

To the extent Acklin challenges the adequacy of counsel's investigation, Acklin failed to show that the investigation was unreasonable under the circumstances. As outlined above in Part I, counsel spent considerable time on the case and planned for the penalty phase by getting the names of character witnesses from family members, interviewing several witnesses, and consulting expert witnesses.

Moreover, trial counsel specifically inquired about whether there had been any abuse in the family, but Acklin and his family members did not disclose the alleged abuse until two days before his trial. Again, once counsel found out about the alleged abuse, counsel confronted Theodis and then consulted extensively with Acklin, who expressly prohibited them from introducing any evidence of the alleged abuse.

Acklin is due no relief on this claim.

*Acklin*, 266 So .3d at 114–15.

Acklin contends that the ACCA's conclusion that his trial counsel conducted an adequate mitigation investigation was an unreasonable application of *Strickland*, *see* U.S.C. § 2254(d)(1), and an unreasonable determination of the facts in light of the evidence in the record, *see* 28 U.S.C. § 2254(d)(2).

Discussion begins with the rule that competent counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Acklin's first contention is that it was unreasonable for the ACCA to have so heavily relied upon the fact that

Acklin's family denied that any abuse occurred until shortly before trial. However, Eleventh Circuit precedent has "repeatedly held that '[a]n attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him.'" *Puiatti v. Sec'y, Fla. Dep't of Corrs.*, 732 F.3d 1255, 1281 (11th Cir. 2013). Indeed, "the reasonableness of a defense attorney's investigation depends heavily on the information provided by the defendant." *Morrow v. Warden*, 886 F.3d 1138, 1147–48 (11th Cir. 2018) (cleaned up). The Eleventh Circuit's case law conforms with *Strickland*, in which the Supreme Court explained that "[c]ounsel's actions are usually based, quite properly, . . . on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." 466 U.S. at 691.

Here, uncontradicted evidence shows that Rahmati asked Acklin and his family "about whether there had been any abuse in the family," but they denied that any severe abuse had ever taken place. Acklin and his family did not just fail to mention the allegations of abuse by Theodis, they also offered contrary representations when asked about it point blank. Nonetheless, Acklin maintains that despite his and his family's unequivocal statements that no abuse occurred, his counsel should have interviewed Velma (without Theodis present) earlier in their investigation; should have interviewed Steve Acklin, Acklin's brother; and should

68

have independently requested records from the state agency that investigates child abuse. However, "[t]he Constitution imposes no burden on counsel to scour a defendant's background for potential abuse given the defendant's contrary representations or failure to mention the abuse." *Stewart*, 476 F.3d at 1211. In short, Acklin places a responsibility on counsel that is not required under the law.

Nonetheless, Acklin contends that the Eleventh Circuit case law cited above conflicts with the Supreme Court's decision in *Rompilla v. Beard*. Acklin asserts that under *Rompilla*, the fact that Acklin did not inform Rahmati about the abuse early in the case does not change the fact that Rahmati had an independent duty to investigate whether he suffered from abuse. However, Acklin's reliance upon *Rompilla* is to no avail because *Rompilla* is a specific application of *Strickland* to materially different factual circumstances from those present in this case. Counsel in *Rompilla* were held to have conducted an inadequate investigation, despite having interviewed the defendant, five members of the defendant's family, and three mental-health experts, because counsel failed to examine the defendant's prior conviction for rape and assault, a "readily available" public document located "at the very courthouse where" the defendant's trial would be held. *See* 545 U.S. at 381–84. Counsel's failure to investigate the defendant's prior conviction was unreasonable because that conviction could serve as an "aggravator" under

Pennsylvania's death-penalty law and counsel knew, as evidenced in a "plea letter" written by counsel, that prosecutors planned to seek the death penalty on the basis of that conviction. *Id.* at 383–84; *see also id.* at 390 ("Other situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction in this way, might well warrant a different assessment."). *Rompilla* requires "reasonable efforts to obtain and review material counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 545 U.S. at 377. This directive does not require a particular level of investigation in every case. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.* at 383. Acklin fails to acknowledge any aggravation evidence offered by the State that Rahmati did not obtain prior to the sentencing. Therefore, the state courts' conclusion that Rahmati's performance was not deficient is not contrary to nor an unreasonable application of Supreme Court precedent.

Acklin's other argument is that because his counsel failed to conduct a reasonable mitigation investigation, the waiver that he signed could not have been knowing and voluntary and thus has no legal effect. Acklin cites no case law to support this contention, and the Court has independently found none. As the ACCA noted, in *Landrigan*, the Supreme Court stated that it has "never imposed an

'informed and knowing' requirement upon a defendant's decision not to introduce evidence." 550 U.S. at 479. Further, the Eleventh Circuit has stated that there is no Supreme Court "authority post-[*Landrigan*] indicating that a competent capital defendant's decision not to present any mitigating evidence may be informed or knowing only if trial counsel first thoroughly or even adequately investigates the mitigating evidence and tells [his] client about it." *Krawczuk v. Sec'y, Fla. Dep't of Corrs.*, 873 F.3d 1273, 1300 (11th Cir. 2017). The Eleventh Circuit has thus stated that "it was *not* clearly established federal law that a defendant's refusal to allow the presentation of mitigating evidence must be informed and knowing." *Allen v. Sec'y, Fla. Dep't of Corrs.*, 611 F.3d 740, 764 (11th Cir. 2010) (citing *Landrigan*, 550 U.S. at 478). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles*, 556 U.S. at 122 (cleaned up).

Regarding the voluntariness of the waiver, Acklin offers no explanation or argument for how an inadequate mitigation investigation could render a waiver involuntary. Nor does he cite any supporting case law. Moreover, Acklin received an evidentiary hearing, but he offered nothing to suggest that his waiver of the presentation of abuse evidence was involuntary. Thus, the ACCA reasonably found that Acklin did not prove "that he is entitled to relief on his claim that he was not

knowing and informed when he signed the statement prohibiting his attorneys from introducing evidence of the alleged abuse."

### 3.     Failing to Inform the Court that the Jail was Medicating Acklin with Xanax During his Trial

Acklin next claims that his trial lawyers were ineffective for failing to inform the trial court that the jail was medicating Acklin, which affected his demeanor at trial. Specifically, Acklin recounts that three days before trial, the Madison County Jail began giving him a daily dose of .5 milligrams of Xanax, an anti-anxiety drug with sedative effects. Acklin faults Rahmati for failing to inquire about the drug or its effects, even though Rahmati was informed that Acklin was taking it. Acklin further faults Rahmati for not requesting a jury instruction on the ways in which the drug might affect Acklin's demeanor. He also claims that Rahmati should have informed the court about the drug, noting that the court specifically relied on Acklin's lack of remorse—displayed by his "gaze that was devoid of emotion," T.C. at 294—as a reason for imposing the death penalty.

Acklin raised this claim in his Rule 32 proceedings in state court, and the ACCA affirmed the Rule 32 court's denial of relief, as follows:

> Acklin argues that his trial counsel were ineffective for failing "to inform the court that the jail was medicating Acklin with Xanax, which affected his demeanor at trial."18 (Acklin's brief, p. 34.) Acklin asserts:

Three days before trial, the Madison County Jail began giving Nicholas Acklin Xanax, an anti-anxiety drug with sedative effects. As pharmacologist Dr. Pamela Sims explained at the Rule 32 hearing, Xanax is used primarily to treat anxiety and cause sedation: "The purpose of Xanax is to remove emotion from [the patient]." R. 555. Acklin was receiving a "significant dose" of the drug, R. 549, such that it would be expected to have sedative effects, moving a person toward sleep even if he were in a highly emotional situation.

. . .

Although Rahmati knew that the jail had begun giving Acklin a new drug shortly before trial "to help him calm down," R. 145, he did not take any steps to inquire about the drug or its effects. Accordingly, Rahmati did not request a jury instruction on the ways in which the drug might affect Acklin's demeanor. He also did not inform the court about the drug, even when the court specifically relied on Acklin's lack of remorse—displayed by his "gaze that was devoid of emotion," [Trial C. 294]—as a reason for imposing the death penalty.

(Acklin's brief, pp. 34–35.)

The circuit court rejected this claim. It found:

Mr. Rahmati also testified that he was aware that Acklin was given additional medication at the Madison County Jail during his trial, but Mr. Rahmati could not recall specifically what Acklin was given. At the time of Acklin's trial Mr. Rahmati and Mr. Gray had represented him for more than two years. During Acklin's trial, neither Mr. Rahmati nor Mr. Gray noticed his affect or demeanor was any different than at any other time during their representation. Mr. Rahmati also testified that Acklin's

demeanor at the Rule 32 evidentiary hearing was the same as it was during his capital murder trial years before.

This Court notes that there is nothing in the trial record, and Acklin presented no evidence at the evidentiary hearing, indicating that Acklin ever complained to Mr. Rahmati or Mr. Gray that the medication he was prescribed during his trial affected his ability to assist[] in his defense. Furthermore, in observing Acklin during the course of the evidentiary hearing, the Court notes that Acklin displayed a flat and subdued demeanor, which appeared to be consistent with[] his demeanor at trial based upon descriptions of same in the record. Acklin also presented no evidence proving that anyone that observed him during his trial informed Mr. Rahmati or Mr. Gray that Acklin's appearance or demeanor was anything other than normal. Acklin also failed to present any evidence establishing that he objected to being administered Xanax during his trial or that he or anyone reported to Mr. Rahmati, Mr. Gray, or to any jail personnel that he was experiencing side effects from the drug.

(C. 4001–02.) The findings of the circuit court are supported by the record, and Acklin has not demonstrated that he is entitled to relief on this claim.

*Acklin*, 266 So. 3d at 115–16.

Acklin argues that the state court's rulings constitute an unreasonable determination of the facts in light of the evidence in the record, *see* 28 U.S.C. § 2254(d)(2), and involved an unreasonable application of *Strickland*, *see* 28 U.S.C. § 2254(d)(1).

Acklin quotes statements from Justice Kennedy's concurrence in *Riggins v. Nevada*, including, "As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion." 504 U.S. 127, 143–44 (1992) (Kennedy, J., concurring). Of course, *Riggins* did not establish that counsel performs deficiently by not informing the court that the defendant is taking anti-anxiety medication.

Acklin specifically argues that it was an unreasonable determination of the facts for the state courts to have taken into account that Rahmati testified that he noticed no difference in Acklin's demeanor during his capital murder trial and his Rule 32 proceedings, when he was not taking Xanax. According to Acklin, this conclusion overlooks the fact that since no one had ever seen what Acklin's demeanor would have been like during his capital murder trial had he *not* been under the influence of Xanax, there was no basis for a comparison. However, as the ACCA noted, Acklin's counsel had represented him for over two years at the time of his trial and certainly would have been familiar with his demeanor in various situations. Additionally, it was not unreasonable for the state courts to have found that Acklin's demeanor at the evidentiary hearing (when he was not taking Xanax) was at least relevant as a comparative tool in assessing the claim. The Rule 32 hearing was

possibly Acklin's last chance to offer evidence attacking his conviction and death sentence. Yet, Acklin maintained his "flat and subdued demeanor." Vol. 35, Tab #R-85, at C. 4002. The Rule 32 court's consideration of Acklin's demeanor at the evidentiary hearing was certainly not "so lacking in justification as to give rise to error beyond any possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 103.

More importantly, it was Acklin's burden to prove that the Xanax negatively affected his demeanor at trial, not simply to offer testimony about the effects of Xanax in the abstract. Yet, he offered no evidence that either his family or his trial counsel noticed anything troubling about his behavior or that his ability to assist his counsel was affected in any way. *See* Vols. 40–41, Tab #R-90, at R. 153–54, 299–300. To the contrary, Rahmati testified at the hearing, "If I had noticed that Nick was acting in any way that would be damaging either to himself or to our case, I certainly would have mentioned something to the Court." Vol. 40, Tab #R-90, at R. 146. Acklin failed to prove that his counsel performed deficiently by failing to inform the court about the Xanax.

Nonetheless, Acklin also argues that it was an unreasonable determination of the facts for the state courts to have relied upon the fact that Acklin never complained to Rahmati or to anyone else that he was experiencing side effects from

the drug in rejecting his claim, because the drug's sedative effects would have made Acklin *less able to complain* about the drug's side effects. Yet, as noted, Acklin did not prove that the dosage he was taking during the trial *in fact* affected his demeanor or ability to assist his counsel with his defense. Speculating at this stage that Xanax would have diminished Acklin's ability to complain to Rahmati that the Xanax was negatively affecting him is not appropriate.

Finally, Acklin asserts that even if Rahmati did not recognize the issue as significant during trial, he surely had a duty to inform the court of the medication that was being given to Acklin when the trial court expressly relied on Acklin's flat demeanor in its sentencing order. In its sentencing order, the trial court merely found that "the defendant's father says that he is remorseful" was not a statutory mitigating circumstance. Acklin omits the other reasons why the trial court so found, as follows:

> The defendant's father testified that Acklin was remorseful. While the Court finds that the testimony on this point by the defendant's father is not contradicted, the Court is not convinced that the defendant is remorseful. The defendant did not apologize to the victims' families, either in the second stage or third stage sentencing hearing. He never uttered a word of remorse. Acklin even had a half-smile or smirk on his face when the court was sentencing him to death. The defendant glared at each of the witnesses with a gaze that was devoid of emotion. The defendant is clearly not remorseful. The court finds that this statutory mitigating circumstance is not applicable.

Vol. 2, Tab #R-2, at C. 294. The trial court certainly did not rely upon Acklin's demeanor as an aggravating circumstance or expressly consider it in the weighing of the mitigating and aggravating circumstances. Finally, as quoted in section IV.B.1 of this opinion, *supra*, the ACCA also found that Acklin had not demonstrated prejudice flowing from his counsel's alleged failure to inform the trial court about the Xanax. *See Acklin*, 266 So. 3d at 116. The ACCA rejected Acklin's claim that "the two main factors the trial court weighed against Acklin were his positive upbringing and his unemotional demeanor in court." *Id.* The ACCA ruled:

> The sentencing order is clear that the two main factors the court weighed against Acklin were the two aggravating circumstances— which, the sentencing court said, would have each independently outweighed the mitigating circumstances. Furthermore, as the State notes in its brief, the sentencing court made clear that "[t]he vicious ruthlessness of the murders was more than sufficient" to justify the sentence of death. (State's brief, p. 59.)

*Id.* Given the foregoing, Acklin has not demonstrated that the ACCA's decision was unreasonable.

The Court also notes that Acklin argues that the state courts unreasonably declined to analyze his ineffective assistance of counsel claims cumulatively. However, the ACCA appropriately held that because he failed to demonstrate deficient performance, there was no opportunity for the court to engage in a cumulative-effect analysis. *Acklin*, 266 So. 3d at 116. That finding is reasonable and

consistent with the Eleventh Circuit's approach to alleged errors by counsel and resulting prejudice. *See Morris v. Sec'y, Dep't of Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012) ("We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole."). Habeas relief is not warranted on the ineffective assistance of counsel claim.

### C.     Acklin's claim that the State's peremptory strikes violated *Batson* v. *Kentucky,* 476 U.S. 79 (1986)

Acklin, who is Black, argues that the trial court and the ACCA unreasonably applied clearly established federal law, including *Batson*, and unreasonably determined the facts in light of the record, when they held that the State did not exercise peremptory strikes of black potential jurors in a racially discriminatory manner. Acklin divides up his claim into five subclaims, so each will be addressed in turn.

#### 1.     *Acklin's subclaim that the ACCA unreasonably failed to find a* Batson *violation regarding potential juror C. Holley because the State's asserted reason for striking him was pretextual*

During voir dire, the State attempted to strike potential juror C. Holley ("Mr. Holley") for cause because, as the prosecutor stated, he "did not fill out but probably two percent of the questionnaire which begs the question, can he read and write [sic] and I tend to believe he can't." T.R. at 348. Acklin's defense counsel agreed that

Mr. Holley could not read and write but objected to the strike for cause, noting that the case did not involve any written evidence and that there would be other jurors who could "read for him or answer any questions for him." *Id.* The trial court noted that Alabama has traditionally been a state with a high rate of illiteracy and expressed doubt that the fact that someone cannot read is a valid challenge for cause. *Id.* at 349. It was noted by the parties that defense counsel might introduce a written report by a doctor at the penalty phase, if the trial proceeded that far. *Id.* at 350. The trial court denied the challenge for cause. *Id.* at 351. The State then asked if the trial judge would "maybe inquire, Mr. Holley, why did you not fill out your questionnaire, do you have trouble reading?" *Id.* The trial judge declined to do so and instead offered the State an opportunity to "ask him a few questions." *Id.* The prosecutors refused, claiming that they did not want to appear as though they were "picking on him." *Id.* at 351–52.

Later in voir dire, Acklin raised a *Batson* challenge with regard to each of the black potential jurors that the State peremptorily struck. The following exchange occurred:

> MR. MCDANIEL: We make a *Batson* motion. Our records show that there were nine African Americans left on the panel, if I am correct, and the State used seven of their strikes – they struck seven of the nine African Americans. We think that is a prima facie showing and we ask the court to so find and go from there.

THE COURT: The court finds the defendant made a prima showing under *Batson*. You have to designate – I assume you're challenging every one of their seven strikes?

MR. MCDANIEL: Yes, sir.

THE COURT: We will proceed to take them one at a time.

*Id.* at 375–76.

With regard to defense counsel's *Batson* challenge concerning Mr. Holley specifically, the following exchange occurred:

MR. BROUSSARD: Judge, the State's reason for striking Number 38, Mr. Holley was quite simply – out of 100 prospective jurors that filled out a fairly lengthy questionnaire, if I recall, seven or eight page long questionnaire, he is the only one out of 100 who failed to fill one out. He provided some information on it if I recall correctly, printed his name on it and maybe one or two other items and in that this case may involve some evidence that is of a written nature, by that very nature, he would be hamstrung, for lack of a better word, in his deliberations and for that reason, we struck him.

MR. RAHMATI: Your Honor, again we would –

THE COURT: Okay, you have to wait for me to – alright, I rule they have set forth a race neutral reason for striking Juror Number 38 and the burden now shifts to the defense to attempt to show that was pretextual.

MR. RAHMATI: Your Honor, just like we argued before the Bench, first I know the state says they may be presenting some evidence that is going to require a person to be able to read and write to decipher it so they can form their own opinion – independent opinion of other jurors. I don't know precisely what that written evidence is going to be. There is no statement by the defendant that is going to be admitted. All the other evidence is going to come in by way of testimony, which Mr.

Holley can clearly understand. The only thing written is the charts that has numbers on it and dots and pictures of people drawn on it.

MR. TAYLOR: Also, when I was conducting voir dire, when I was asking questions to the panel, I was looking at him and I saw nothing whatsoever – he would raise his hand and nod, he was responsive. There was nothing that I saw that indicated in any way that this man could not go by the Judge's charges and listen to the evidence. He did not just sit there, he was an active participant in voir dire along with everybody else. I saw nothing different from him than the Caucasians in the room.

MR. BROUSSARD: Judge, if – I am sorry.

THE COURT: Can you tell me specifically what types of written exhibits will be introduced at this trial?

MR. BROUSSARD: No, sir, and I did not – either I misstated something or Behrouz misstated something, but I can't tell you I expect that the state expects to put into evidence any written material, but in informal discussions I think the possibility exists that there will be written evidence entered in this case and, specifically, it was contemplated at one time possibly the defense putting one in during sentencing phase if we get that far.

MR. TAYLOR: For instance, the permission to search signed by Candice Wilson, that is one I think of off the bat.

MR. BROUSSARD: That may be the only document we have, but there is a fair likelihood there will be written material in this case and as far as if something is pretextual, you know, by the same token we have two Caucasians and Mr. Knox and Ms. Bowers who are there, who neither one of them can hear, have told them – that we struck them, and it just appears that, you know, out of 100, only one was unable to fill out any information on the sheet and it is for that reason that we struck him.

MR. TAYLOR: May I say, your Honor, there are – there is a wealth of competent jurors. We should not be forced to take one who is, at best,

would be borderline competent and we say incompetent to hear the evidence in this case and weigh it and evaluate it and arrive at a proper decision just because he happens to be black.

MR. MCDANIEL: In voir dire when I talked to the entire panel, I looked at that individual and he responded like everybody else did, he was active in his participation and raised his hand and would nod his head. He can certainly, Your Honor, understand that evidence and understand the Court's charge in my opinion.

MR. TAYLOR: He did not understand when the Judge asked him if he could read and write and understand the English language, he said he could and obviously he can't.

MR. GRAY: Your Honor, there may be a number of reasons he did not indicate that he could read and write in front of 99 other folks, one being embarrassed by it. We often ask jurors to listen to evidence and consider evidence and weigh evidence that they have difficulty understanding. We will have expert evidence in this case that they will hear testimony about and see written reports about – possibly but those jurors will have the benefit of having an expert witness or any other witness testify to what is contained in that evidence. If we strike Mr. Holley basically because he cannot read, we are discriminating against him because of his disability, maybe not discrimination because of race, but we are taking an arbitrary factor into account that should not be permitted under the Law.

THE COURT: Let's go and do the other ones and I will come back and rule on that one last and give you my final ruling. I want to think about it for a minute[].

. . .

THE COURT: . . . Let me also tell you before you decide what you want to do that the – I have decided that the challenge to Juror Number 38 is overruled.

*Id.* at 372–82, 394.

Acklin raised the claim that the State violated *Batson* in striking Mr. Holley on direct appeal to the ACCA. The entirety of Acklin's argument on direct appeal consisted of the following:

> The Prosecutor stated he struck Juror [C.H.] because he was the only juror who did not fill out a questionnaire. They felt some evidence maybe written and because of his lack of response he could not read or write. (R.379). In response to show this strike was pretextual Acklin's attorneys showed that there was no written statement of Acklin. The only evidence was to come through testimony in open Court; and pictures or graphs. In addition, throughout the voir dire, Juror [C.H] responded to both sides well indicating he fully understood all proceedings. Acklin contends that Juror [C.H.] had the right to serve on the jury as the Caucasians that were not struck.

Vol. 11, Tab #R-39, at 34–35.

The ACCA denied the claim on the merits, writing as follows:

> Acklin next argues that the trial court erred in denying his motion pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986), as to two African–Americans on the venire, M.L. and C.H. The United States Supreme Court in *Batson* held that the Equal Protection Clause prohibits the removal of African–Americans from a defendant's jury solely on the basis of their race. The party making a *Batson* objection must first establish a prima facie case of discrimination in the striking of the jurors. Here, the trial judge found a prima facie case of discrimination after the prosecution used seven of its peremptory strikes to remove seven of the nine African–Americans on the venire.
>
>> After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723. The state then has the burden of articulating a clear, specific, and legitimate reason for the

challenge which relates to the particular case to be tried, and which is nondiscriminatory. *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723. However, this showing need not rise to the level of a challenge for cause.

*Ex parte Branch*, 526 So. 2d 609, 623 (Ala. 1987).

. . .

As to prospective juror C.H., the prosecutor gave the following reasons:

> MR. BROUSSARD: Judge, the State's reason for striking number 38, [C.H.], was, quite simply, out of 100 prospective jurors that filled out a fairly lengthy questionnaire—If I recall, seven or eight page long questionnaire—he is the only one out of 100 who failed to fill one out. He provided some information on it, if I recall correctly; printed his name on it and maybe one or two other items. And in that this case may involve some evidence that is of a written nature, by that very nature, he would be hamstrung, for lack of a better word, in his deliberations. And for that reason, we struck him.

(R. 379.) Earlier in the voir dire, in a discussion as to whether C.H. was qualified to be a juror, all the parties came to the conclusion that C.H. was unable to read or write. The trial judge overruled the prosecution's challenge for cause, but, after discussing with the parties what written evidence might be introduced during the trial, the trial judge found the reason for the peremptory strike to be race-neutral. (R. 348–52.) Section 12–16–60(a)(2), Ala. Code 1975, requires that a juror be able to "read . . . instructions given by a judge in the English language." This court has found illiteracy to be a race-neutral reason for a peremptory strike and has upheld a prosecutor's peremptory strike based on that reason. *See Wright v. State*, 601 So. 2d 1095 (Ala. Crim. App. 1991); *Williams v. State*, 548 So. 2d 501 (Ala. Crim. App. 1988).

The standard for reviewing a trial judge's decision on a *Batson* issue gives great deference the trial judge's decision. *Hall v. State, supra.*

> "The trial court's ruling on a *Batson* motion will be reversed only if clearly erroneous." *Nance v. State*, 598 So. 2d 30, 31 (Ala. Crim. App. 1992); *Jackson v. State*, 594 So. 2d 1289, 1294 (Ala. Crim. App. 1991). "It is well settled that the ruling of the trial court on a *Batson* hearing is entitled to substantial deference and will not be disturbed on review unless it is 'clearly erroneous.'" *Ex parte Bankhead*, 625 So. 2d 1146 (Ala. 1993).

*Farrior v. State*, 728 So.2d 691, 698 (Ala. Crim. App. 1998), quoting *Merriweather v. State*, 629 So. 2d 77, 88 (Ala. Crim. App. 1993). We cannot say, after a careful review of the record, that the race-neutral reasons advanced by the prosecutor for the peremptory strikes were a sham, nor is there any evidence of disparate treatment between prospective African–American jurors and prospective white jurors.

The record supports the trial court's ruling on the *Batson* motion as to prospective juror[ ] C.H. The trial court correctly denied Acklin's *Batson* motion.

*Acklin*, 790 So. 2d at 987–89.

Pursuant to 28 U.S.C. § 2254(d)(1)-(2), Acklin must establish not only that his *Batson* claim is meritorious but also that the ACCA's rejection of the claim was either an unreasonable determination of the facts in light of the evidence presented in the state court proceeding or was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

In *Batson*, the Supreme Court held that the Equal Protection Clause prohibits prosecutors from striking potential jurors "solely on account of their race." 476 U.S. at 89. To assist district courts in addressing *Batson* challenges, the Supreme Court outlined a three-step inquiry that courts must use to determine whether peremptory strikes have been used in a discriminatory manner. First, the party challenging the strike as discriminatory must set forth a prima facie case of discrimination. *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 636 (11th Cir. 2000) (citing *Batson*, 476 U.S. at 96). "'[I]n making out a prima facie case, 'the defendant must point to more than the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal.'" *Id.* at 637 (quoting *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990)). Second, if the court agrees that a prima facie case exists, the striking party must articulate a non-discriminatory (i.e., race-neutral) explanation for its strike. *Id.* at 636. "The reason given need not be a good reason; it can be irrational, silly, implausible, or superstitious, as long as it is facially race-neutral." *United States v. Lovett*, 662 F. App'x 838, 844 (11th Cir. 2016) (citing *United States v. Hill*, 643 F.3d 807, 837 (11th Cir. 2011)). Finally, if the striking party gives a race-neutral rationale, the court must evaluate the persuasiveness of the proffered reason and determine whether the objecting party

has carried its burden of proving purposeful discrimination. *See id.* (citing *Hill*, 643 F.3d at 837).

In the context of a *Batson* claim, "a federal habeas court can only grant [a habeas] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006). The *Batson* inquiry "does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." *Id.* (cleaned up). Moreover, the requirement that a habeas petitioner rebut by clear and convincing evidence the presumption of correctness that attaches to state court factual findings is particularly true in the context of a *Batson* claim on collateral review. *See Davis v. Ayala*, 576 U.S. 257, 274 (2015). The Supreme Court has described the tremendous deference with which a trial court's factual findings regarding credibility and demeanor must be reviewed:

> We have previously recognized that peremptory challenges are often the subjects of instinct and that race-neutral reasons for peremptory challenges often invoke a juror's demeanor. A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes. As we have said, these determinations of credibility and demeanor lie peculiarly within a trial judge's province, and in the absence of exceptional circumstances, we will defer to the trial court. Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation.

*Id.* at 273–74 (cleaned up).

As an initial matter, English language proficiency is a valid race-neutral reason for exercising a peremptory strike. *See Ayala*, 576 U.S. at 278 ("The prosecution had an obvious reason to worry that service on this jury would have strained [the juror's] linguistic capability."). Acklin complains that the prosecutors should have questioned Mr. Holley as to his literacy level but instead just assumed that he was illiterate. In support, Acklin relies upon *Miller-El v. Dretke*, 545 U.S. 231, 250 n.8 (2005) ("the failure to ask undermines the persuasiveness of the claimed concern"). However, both the State and defense counsel agreed that Mr. Holley could not read or write. *See* Vol. 8, Tab #R-14, at TR. 348 (Rahmati: "[H]e can't read or write"). Thus, the record does not support the notion that the State should have questioned him further. Moreover, even if the State were mistaken about the extent of Mr. Holley's ability to read and write, the Eleventh Circuit has held that "neither a prosecutor's mistaken belief about a juror nor failure to ask a voir dire question provides clear and convincing evidence of pretext. *Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009) (cleaned up); *see also Lee v. Comm'r, Ala. Dept. of Corrs.*, 726 F.3d 1172, 1226 (11th Cir. 2013) ("The conclusion that an honestly mistaken but race-neutral reason for striking a black venire member did not violate *Batson* was not unreasonable."). This argument does not support Acklin's claim.

Acklin also asserts that prosecutors could not identify any written evidence that might be admitted at trial. However, the State thought that they might, and did in fact, introduce evidence at the guilt phase that required reading by the jurors. *See* Vol. 2, Tab #R-3, at C. 329, 334 (document giving permission to search). Also, the defense left open the possibility of introducing a report by Dr. Lawrence Meyer at the penalty phase. *See* Vol. 8, Tab #R-14, at TR. 350. This argument, too, does not support Acklin's claim.

In sum, Acklin has not shown by clear and convincing evidence that the State's stated reason for striking Mr. Holley was pretextual.

> 2.    *Acklin's subclaim that the ACCA unreasonably failed to find a* Batson *violation regarding potential juror M. Lockhart because the State's asserted reason for striking her was pretextual*

Acklin next claims that the State's peremptory strike of black potential juror M. Lockhart ("Ms. Lockhart") was similarly pretextual. Since the trial court ruled that Acklin had made a prima facie showing under *Batson* as to each of the seven black potential jurors that the State peremptorily struck, the trial court gave the State the opportunity to assert race neutral reasons for each. The following exchange occurred with regard to Ms. Lockhart:

MR. RAHMATI: The first juror that was struck was Number 54.

THE COURT: That is correct.

MR. RAHMATI: Ms. [M.] Lockhart.

THE COURT: That was the state's seventh strike.

MR. BROUSSARD: Judge, our reasons for striking Prospective Juror 54, Ms. Lockhart, was she had approached the Bench at one point during voir dire proceedings and expressed her opinion that she is opposed to the death penalty. She did say she would be able to follow the law, but under peremptory strikes, she made clear that she was opposed to the death penalty, that she knows the defendant, Mr. Acklin's, mother. Something about an uncle had married an aunt and they had played together as children. Additionally, she has -

MR. TAYLOR: Three.

MR. BROUSSARD: A prior arrest on issuing worthless checks.

MR. TAYLOR: Three.

MR. BROUSSARD: Three IWC's and for those reasons we excused Ms. Lockhart.

THE COURT: The court rules that the state has stated a race neutral reason for striking Juror 54, the burden shifts to the defendant. If they desire to make a further presentation to attempt to show those reasons are pretextual.

MR. RAHMATI: Your Honor, I don't - my notes reflect that when she was called before the Bench she expressed some concerns about the death penalty, but that she said she did not have a fixed opinion about the death penalty. That she could hear the facts and if they were so bad that they deserved, you know, punishment that would justify death, she could probably do it.

MR. GRAY: There was no showing, Judge, from our conversation with her at the Bench that she would be unfair or lean towards the defense in any way. She did indicate that she didn't favor the death penalty, but she said she would follow the law, which is all we ask any juror to do.

Finally, on an issuing worthless check charge – do you know if all three charges occurred at the same time? Do we know how old they are?

MR. TAYLOR: No, but we have a list of all the people that have had offenses, worthless checks, assaults, DUI's and whatever and we have stricken every one of those. Of course, you got some of them for us, but we went down our list of prior convictions and struck every one of them.

MR. GRAY: Your Honor, in light of the nature of the charge of issuing a worthless check, we don't know when it occurred, so we have no idea if this was a recent charge or the charge could be years old for all we know. I don't think that is sufficient by the State in light of the other things we discussed, to overcome a showing of pretext in regards to Ms. Lockhart.

MR. BROUSSARD: What about playing with the defendant's mother as children?

MR. GRAY: I did not have that in my notes.

THE COURT: She did say that.

MR. GRAY: Did she? I don't recall that.

THE COURT: Alright.

MR. RAHMATI: That was years ago.

THE COURT: For all three of the – well, let me start again. The Court overrules the *Batson* challenge. Alright proceed on to the next one that was struck which would have been Juror 38.

MR. BROUSSARD: Just for the record on the last prospective juror, the record shows the issuing worthless checks were '87, '85 and '95, is that right? 1985, 1989 and 1995, issuing worthless checks.

T.R. at 376–79.

Acklin raised the claim that the State violated *Batson* in striking Ms. Lockhart on direct appeal to the ACCA. The entirety of Acklin's argument on direct appeal consisted of the following:

> The reason for striking Juror [Ms. Lockhart] was because she had expressed some concerns over the death penalty, she had some contact with the [sic] Acklin's mother and she had charges of issuing worthless checks. (R.376–77). Juror [Ms. Lockhart] said she did have some concerns about the death penalty but she did not have a fixed opinion and could consider the evidence. (R.377). Further, the time she lived near the [sic] Acklin's mother was many years ago and the worthless check charges were filed in 1985, 1987, and 1995. (R.378). Acklin contends that the State did not overcome a showing of pretext on this juror.

Vol. 11, Tab #R-39, at 34.

The ACCA rejected the claim on the merits, writing:

> As to M.L., the prosecutor offered the following reasons for his peremptory strike:
>
> > MR. BROUSSARD (prosecutor): Judge, our reasons for striking Prospective Juror 54, [M.L.], was she had approached the bench at one point during voir dire proceedings and expressed her opinion that she is opposed to the death penalty. She did say she would be able to follow the law, but under peremptory strikes, she made clear that she was opposed to the death penalty. That she knows the defendant, Mr. Acklin's, mother—something about an uncle had married an aunt—and they had played together as children. Additionally, she has . . . three . . . prior arrests on issuing worthless checks. . . . For those reasons we excused M.L.

(R. 376–77.) The record shows that M.L. related that, as a child, she often visited relatives who lived next door to Acklin's mother, and that she and Acklin's mother often played together as children. (R. 321.) As to M.L.'s opposition to the death penalty, she related the following during voir dire:

> M.L.: Did I oppose the death penalty and, yes, I am opposed—in opposition of the death penalty because I feel to kill is to kill and individuals, one-on-one or a panel of 12 people on a jury, it is still a murder.

> MR. TAYLOR (prosecutor): Then, ma'am—May I, Judge? Are you saying you would not vote for the death penalty? You think it is wrong?

> M.L.: I personally would not like to vote for it, no, I would not.

> MR. TAYLOR: You say you would not like to. If you were on the jury—

> M.L.: If I was selected on the jury and the evidence presented was to the point that they were found guilty of capital murder, and the recommended sentences would be death, as part of the jury, I would have to do it.

> MR. TAYLOR: You are the one that will make the recommendation.

> M.L.: Me and 11 others.

> MR. TAYLOR: And you could vote for the death penalty?

> M.L.: I think if the evidence were—then I could.

(R. 229–30.)

The peremptory strike of a prospective juror who had expressed reservations about the death penalty was sufficiently race-neutral so as to not violate *Batson. Hall v. State*, [Ms. CR–94–0661, October 1, 1999], ––– So. 2d ––– (Ala. Crim. App. 1999). Mixed feelings or reservations regarding imposition of the death penalty are valid race-neutral reasons for peremptory strikes and do not violate *Batson. Smith v. State*, 531 So. 2d 1245 (Ala. Crim. App. 1987). Additionally, the peremptory strike of a prospective juror who had prior convictions has also been held to be race-neutral. *Jackson v. State*, 549 So. 2d 616 (Ala. Crim. App. 1989).

*Acklin*, 790 So. 2d at 987–88.

Before addressing the reasonableness of the ACCA's decision, the Court first notes that, in his federal habeas petition, Acklin adds facts and arguments that he never presented to the state courts. He argues for the first time that "the prosecutors accepted white prospective jurors who expressed much stronger opposition to the death penalty." In support, he contends that white prospective juror G. Frost ("Ms. Frost") repeatedly declared her inability to vote for the death penalty. *See* T.R. at 230 ("I could not sentence somebody to death. I don't care what they did."); T.R. at 231 ("I could not do it."); T.R. at 232 ("I could not vote to take someone's life, no."). He adds that the State even tried to challenge Ms. Frost for cause because of her inability to vote for the death penalty, but the trial court denied the challenge and the State initially accepted Ms. Frost as an alternate juror. *See* T.R. at 233. Acklin also points out that the State did not strike white juror L. Light ("Ms. Light"), even

though she wrote on her questionnaire that she "could not impose the death penalty unless I was totally certain of guilt beyond a reasonable doubt." *See* T.C. at 923.

"To properly exhaust a claim, the petitioner must afford the State a full and fair opportunity to address and resolve the claim on the merits." *Kelley*, 377 F.3d at 1343 (cleaned up). "[T]he prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief." *Id.* at 1344; *see also Borden v. Allen*, 646 F.3d 785, 817 (11th Cir. 2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." (quoting *Pinholster*, 563 U.S. at 181)). The Eleventh Circuit has stated, "While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (cleaned up).

Here, Acklin never argued before the state courts that white jurors Ms. Frost and Ms. Light were treated differently than black potential juror Ms. Lockhart. Because he failed to fairly present the "particular legal basis and specific factual foundation" of this claim, *see McNair*, 416 F.3d at 1302, neither the trial court nor the ACCA on direct appeal was given a chance to address it. Accordingly, to the

extent Acklin relies upon this comparison argument, it is denied as procedurally defaulted.

In the alternative, on the merits, Acklin has not shown disparate treatment of white veniremembers with similar characteristics. Acklin relies upon the Supreme Court's statement in *Miller-El*: "[i]f the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects." 545 U.S. at 241. However, white jurors Ms. Light and Ms. Frost were not similarly situated to black potential juror Ms. Lockhart regarding opposition to the death penalty. Regarding white juror Ms. Light, she explained in her questionnaire that she would not impose the death penalty unless she "was totally certain of guilt beyond a reasonable doubt." Vol. 4, at C. 923. Her answer cannot be construed as having reservations about the death penalty. Rather, she simply made clear that she had to be convinced of guilt beyond a reasonable doubt to impose it, which is a requirement of all jurors. Meanwhile, black potential juror Ms. Lockhart's answer to the same question was as follows: "The taking of a life is wrong according to the law, regardless of the circumstances, which, to me, should include sentencing death by a jury." *Id.* at C. 945.

Regarding white potential juror Ms. Frost, she was the State's final strike and designated to serve as an alternate. The State ultimately removed her completely when the trial court reinstated juror O. Langford, as discussed in the next section. For purposes of *Batson* review, Alabama courts "view the alternate jurors as having been struck." *Thompson v. State*, 153 So. 3d 84, 124 n.11 (Ala. Crim. App. 2012) (citing *Ex parte Bankhead*, 625 So. 2d 1146, 1147 (Ala. 1993)). Thus, no disparate treatment occurred since Ms. Lockhart and Ms. Frost were both struck. Acklin has not argued that the Alabama courts' application of *Batson* to alternate jurors is unreasonable. Moreover, there were relevant differences between Ms. Lockhart and Ms. Frost. When Ms. Lockhart was a child, Acklin's mother lived next door to Ms. Lockhart's relatives, and the two "probably played together a lot." Vol. 8, Tab #R-14, at TR. 322. Thus, an additional reason that the State struck Ms. Lockhart was because "she knows the defendant, Mr. Acklin's, mother." *Id.* at TR. 377. The State also struck Ms. Lockhart because she had three "prior arrest[s] on issuing worthless checks." *Id.* Indeed, the State struck every veniremember with previous offenses, regardless of race. *Id.* at T.R. 378, 390. The ACCA recognized that "the peremptory strike of a prospective juror who had prior convictions has also been held to be race-neutral." *Acklin*, 790 So. 2d at 988.

Finally, returning to the reasonableness of the ACCA's ruling that Acklin did not prove that the State's race neutral reason for striking Ms. Lockhart was a pretext for unlawful discrimination, the notion that an aversion to imposing the death penalty is a race neutral reason for a peremptory strike is well-supported. *See, e.g., Ayala*, 576 U.S. at 278 (Jurors were dismissed "for several race neutral reasons, including uncertainty that [they] would be open to imposing the death penalty."); *Bowles v. Sec'y for Dep't of Corrs.*, 608 F.3d 1313, 1317 (11th Cir. 2010) ("[C]learly established federal law, as determined by holdings in Supreme Court decisions, does not prohibit prosecutors from using their peremptory strikes to remove venire members who are not ardent supporters of the death penalty."). Acklin has not demonstrated that the ACCA's ruling was unreasonable.

> ### 3. *Acklin's subclaim that the ACCA unreasonably failed to consider in its* Batson *analysis the fact that the State violated* Batson *when it peremptorily struck black juror O. Langford*

Acklin's third subclaim stems from the fact that the trial court ruled that the State violated *Batson* with regard to its peremptory strike of juror O. Langford ("Mr. Langford"), a 24-year-old black man, reinstated Mr. Langford into the jury pool, and required the State to strike a different prospective juror. According to Acklin, this fact makes it more likely that the State violated *Batson* in peremptorily striking black

potential jurors Mr. Holley and Ms. Lockhart, and the state courts should have taken it into consideration in reviewing Acklin's *Batson*-violation claim on direct appeal.

During voir dire, defense counsel made a *Batson* motion with regard to Mr. Langford, as they did with all of the black potential jurors struck by the State. The following exchange occurred:

> THE COURT: . . . We move to 49.

> MR. BROUSSARD: Number 49, Mr. Langford, he was struck because of his age. Anybody who was born in 1974 or later on this entire panel no matter what their race was struck by the State.

> MR. TAYLOR: And that annotation was made on the list before we started as a consideration. We took 1974 and everybody that was born after that, that was our determination that we wanted a mature jury and anybody after that time – you got a list of them that we struck because of age?

> MR. BROUSSARD: I am sure I do. I can run down the list.

> MR. TAYLOR: I have them marked big, Number 8, Biggs, Number 29, Garrison, Number 46, Kennemer, Number 49, Langford, Number 75, Rogers, Number 76, Roose, Number 78, Sapp – I think he was struck for cause, but we had him listed and that is all and I think only one of those was black.

> THE COURT: What is the birth date that we are looking at in year? I want to take a look at the ones left on here.

> MR. TAYLOR: Everybody born before 1974.

> THE COURT: That was born after 1974?

MR. TAYLOR: That was left on was born before 1974, all the people born after '74 were stricken.

THE COURT: Okay, Alright, that does appear to be correct. I think I know the answer to this, but let me also ask the State and what is your theory as far as helping your case for striking all of the younger people.

MR. TAYLOR: Such a serious offense, Your Honor, they have more maturity, people with more life experiences, hopefully more sound judgment, just a more mature jury.

THE COURT: Alright, the Court rules that they – the State stated a race neutral reason for striking Juror 49. The burden shifts to the defense to attempt to show it was pretextual.

MR. MCDANIEL: This man has a Constitutional right – as an African American man has a Constitutional right to serve on this jury. He has been discriminated against not only because of his race, he is discriminated against because of his age. He has a Constitutional right to serve on the jury and this, Your Honor, is as thin as ice and I think it is pretextual to strike this man because of that and I know there may be some others.

MR. RAHMATI: On top of that I think minimum age requirement is 18 to serve on a jury and regardless of what the State may think about someone's maturity level, that is the law, 18. And even if they're going to practice excluding 23-year olds and younger people from a panel because of a maturity level and even if it may involve white jurors, it still, you know – I don't understand the philosophy behind it and it can be considered race neutral, but considering the totality of what we talked about today, the lack of African American jurors, it certainly denies our client we feel like Constitutional right to be tried by a jury of his peers.

MR. GRAY: Finally, Judge, *Powell versus Ohio* equates serving on a jury with the right to vote, that is how much importance the United States Supreme Court places on the ability for citizens of this nation to serve on a jury. Our State says you have to be 18 or over. We just don't see

how – we can understand the need for a mature jury, but simply based on being born in 1975, I don't believe is enough to say that person is immature. We let them vote, we let them drive and do any other number of civic duties and they should be entitled to serve on a jury.

MR. RAHMATI: Your Honor, you can draw the same analysis on Mr. Holley, their reason for excluding Mr. Holley is that he can't read or write which is a race neutral reason and the Court excepted [sic] that strike.

MR. TAYLOR: Not yet he has not.

MR. RAHMATI: I am sorry, not yet, but the Court is considering it. Here is a man who is 18 and by everyone else's terms considered an adult and I don't think the State can say by the fact he is under 24, he is not mature enough to handle a case like this.

THE COURT: He is not 18, is he?

MR. RAHMATI: He is 24.

THE COURT: You said he is 18.

MR. RAHMATI: What I am implying is they think anyone under 24 is too immature to handle a case like this. If that was the case, the Legislature would not set the age at 18.

THE COURT: This is a very unusual situation. Considering the defendant's age in this case, the *Batson* challenge is sustained. That juror will go back in the pool. The State will have to strike another juror.

Vol. 8, at T.R. 390–94.

On direct appeal, Acklin included the following sentence in his brief: "During the *Batson* challenges the Court ruled that Juror [Mr. Langford] was struck for a reason that did not overcome the pretext established by the Appellant. (R.393)." Vol.

11, Tab #R-39, at 34. That was the only mention of Mr. Lankford that Acklin made to the state courts. Respondent thus argues that Acklin did not fairly present this subclaim to the state courts. The Court agrees. Acklin did not argue during trial or at any level of appeal that the courts should consider the alleged *Batson* violation that occurred with regard to Mr. Langford while analyzing the prosecutors' strikes of Mr. Holley and Ms. Lockhart. Thus, he failed to fairly present the "particular legal basis and specific factual foundation" of this claim, *see McNair*, 416 F.3d at 1302, and neither the trial court nor the ACCA was given a chance to address it. Accordingly, this subclaim is due to be denied as procedurally defaulted.

In the alternative, this subclaim lacks merit. Acklin now argues that it should have been considered relevant, in analyzing the legitimacy of the State's other peremptory challenges, that the trial court found that the State had already engaged in race discrimination in this case. According to Acklin, that finding provides powerful evidence of the prosecutors' intent with respect to their other peremptory challenges, and the state courts should have considered it in evaluating Acklin's remaining *Batson* objections. In support, Acklin cites *Batson*'s directive that "trial court[s] should consider all relevant circumstances" in deciding "whether the defendant has made the requisite showing." 476 U.S. at 96. He also points to cases indicating that evidence of a prosecutor's practice of excluding black prospective

jurors is a relevant part of proving discrimination in jury selection. *See Swain v. Alabama*, 380 U.S. 202, 223 (1965) (evidence of prosecutor's history of removing black prospective jurors is relevant for proving Fourteenth Amendment violation); *Miller-El*, 545 U.S. at 263–64 (considering the prosecution office's history of removing black prospective jurors in evaluating the legitimacy of the peremptory challenges at issue); *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) ("a court would be required to consider the strike of [one black prospective juror] for the bearing it might have upon the strike of" another black prospective juror); *McGahee v. Ala. Dep't of Corrs.*, 560 F.3d 1252, 1264 (11th Cir. 2009) ("Certainly, a statement by the prosecutor that a juror was struck because of his race is a 'relevant circumstance' in determining whether *Batson* was violated.").

Contrary to Acklin's argument, it was not unreasonable that the state courts did not find a *Batson* violation with regard to Mr. Holley and/or Ms. Lockhart merely because the trial court had found that one occurred with regard to Mr. Langford. First, while *Batson* does instruct trial judges to consider "all relevant circumstances" in assessing race-based discrimination challenges, that directive is purposefully open-ended. *See* 476 U.S. at 97 ("These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory

challenges creates a prima facie case of discrimination against black jurors.").

Additionally, two of the Supreme Court cases upon which Acklin relies – *Snyder* and

*Miller-El* – for the proposition that trial courts must consider the bearing that striking

one black juror might have on the striking of another black juror, both post-date the

state courts' rulings on Acklin's *Batson* challenges. As a general rule, Supreme Court

decisions that post-date a state court's determination cannot be "clearly established

law" for the purposes of § 2254(d). *See, e.g., Shoop v. Hill*, 139 S. Ct. 504, 506 (2019).

Finally, *McGahee* is distinguishable in that there, one of the State's three stated

reasons for striking a black juror was that if they left him on the jury, he would be the

only black juror left. 560 F.3d at 1264. It was thus unsurprising in *McGahee* that the

state courts' failure to consider this reason in its analysis was held to be an

unreasonable application of *Batson*. *See id.*

     In any event, an examination of the record reveals that the trial court appears

to have sustained the *Batson* challenge with regard to Mr. Langford as a

precautionary measure, not due to any overt racial animus on the part of the

prosecutors. The State struck every veniremember "born in 1974 or later,"

regardless of race. Vol. 8, Tab #R-14, at TR. 390. For such a serious crime, the State

wanted "people with more life experiences, hopefully more sound judgment, just a

more mature jury." *Id.* at 391. In response, the defense offered nothing to show that

the reason was a pretext for racial discrimination. Instead, they merely contended

that the juror was not too immature and that he was being "discriminated against

because of his age." *Id.* at 392. Although stating that the *Batson* challenge was

sustained, the trial court noted that it was because of Mr. Langford's age, noting that

this was an "unusual situation." *Id.* at 393. Age is a race neutral reason for striking a

juror. *See Smith v. Comm'r, Ala. Dep't of Corrs.*, 924 F.3d 1330, 1347 n.14 (11th Cir.

2019). The record belies the assertion that the State's decision to strike Mr. Holley

and Ms. Lockhart was in any way related to their decision to strike Mr. Langford.

Accordingly, Acklin has not demonstrated that he is entitled to relief on this claim.

> 4. *Acklin's subclaim that the totality of the evidence supports the*
>    *conclusion that the State struck Mr. Holley and Ms. Lockhart because*
>    *of their race*

Acklin's fourth subclaim is that the totality of the evidence supports his *Batson*

claims with regard to Mr. Holley and Ms. Lockhart. He refers to the following

evidence in support of this argument: 1) the State struck seven of the nine black

prospective jurors, either for cause or through peremptory challenges; 2) the trial

court had already found that the State violated *Batson* when it struck Mr. Langford;

3) the State struck Mr. Holley because he was illiterate despite not asking Mr. Holley

any questions about his ability to read; 4) the State struck Ms. Lockhart because of

her views on the death penalty even though she expressed more of an ability to

impose the death penalty than white jurors the State accepted; and 5) the State failed to question the black prospective jurors regarding several of the justifications it later used to remove them from the jury.

Again, Acklin never presented this "totality of the evidence" subclaim to the state courts. Because he failed to present the "particular legal basis and specific factual foundation" of this subclaim, it is due to be denied as procedurally defaulted. *McNair*, 416 F.3d at 1302.

In the alternative, the claim is without merit. Acklin's first assertion is that the pattern of the State's peremptory challenges provides evidence of discrimination. He offers the following statistics in support. At the time of his trial, black residents constituted 19.2% of the Madison County, Alabama population. T.R. at 157. Of the 100 individuals summoned for jury service in this case, ten were black. T.R. at 156. Of the 80 qualified prospective jurors, nine (11%) were black. T.R. at 371, 376. The State used seven of their 34 peremptory strikes (20%) to remove 78% of the qualified black prospective jurors. T.R. at 372–74. Specifically, the State struck Ms. Lockhart (No. 54), Mr. Holley (No. 38), G. Scruggs (No. 32), P. Way (No. 97), F. Horton (No. 40), J. Walker (No. 95), and Mr. Langford (No. 49). Defense counsel peremptorily struck one black prospective juror, L. Quashie (No. 71), because he worked for the Madison County Sheriff's Department. T.R. at 396–97. As noted previously,

defense counsel raised a *Batson* challenge, objecting to the State's use of strikes against black prospective jurors. T.R. at 375–76.

Although a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination, *see Batson*, 476 U.S. at 97, as the Eleventh Circuit explained in *Lowder Realty Co.*, Acklin must show more than "numbers alone" to be successful on a *Batson* claim:

> To begin with, the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial discrimination. The number of persons of a particular race struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck. This Court has held that "[i]n making out a prima facie case, 'the defendant must point to more than the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal'." *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990). A party advancing a *Batson* argument ordinarily should "come forward with facts, not just numbers alone." *United States v. Bergodere*, 40 F.3d 512, 516 (1st Cir. 1994). Consequently, a showing that a party used its authorized peremptory strikes against jurors of one race does not, standing alone, establish a prima facie case of discrimination.
>
> That said, an inference of discrimination based on the number of jurors of a particular race may arise where there is a substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury. *See, e.g., United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991) ("Only a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination."); *United States v. David*, 662 F. Supp. 244, 246 (N.D. Ga. 1987) (finding that "[a]lthough

the percentage of black jurors struck from a jury panel might establish a prima facie case in some instances, here it does not because . . . the number of black persons on the regular panel was small."). Thus, the number of jurors of one race struck by the challenged party may be sufficient by itself to establish a prima facie case where a party strikes all or nearly all of the members of one race on a venire. *See United States v. Williams*, 936 F.2d 1243, 1246 (11th Cir. 1991) (finding a prima facie case where prosecutor struck all of the African–American members of the venire).

236 F.3d at 636-37.

Here, the State here refrained from striking two black potential jurors, one of whom was struck by the defense and one of whom served on the final jury. In fact, two black jurors ultimately served on the final jury when Mr. Langford was reinstated. "[T]he unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race." *Lowder Realty Co.*, 236 F.3d at 638. *See also United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995) ("Although the presence of African-American jurors does not dispose of an allegation of race based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."); *Allison*, 908 F.2d at 1537 (finding that the unchallenged presence of black individuals on a jury undercuts the inference of impermissible discrimination that might arise solely from striking other black prospective jurors); *United States v. Dennis*, 804 F.2d 1208, 1211 (11th Cir. 1986) ("[T]he unchallenged presence of two

blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks from the panel of potential jurors and alternates.").

Moreover, there was also no "substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury." *Lowder Realty Co.*, 236 F.3d at 637. The final jury was 16.7% (two of twelve) black, because two black jurors ultimately sat on the jury once Mr. Langford was reinstated. That percentage is higher than the 11.3% (nine of 80) of qualified veniremembers who were black and approximately in line with the 19.2% black population of Madison County at the time. Taking Mr. Langford out of consideration, the final jury would have been 8.3% black (one of twelve), which is still not substantially different from the 11.3% (nine of 80) of qualified veniremembers who were black. This case's statistics do not suggest that the State engaged in a pattern of discrimination.

Acklin's second, third, and fourth assertions repeat his arguments from sections IV.C.3.; IV.C.1.; and IV.C.2; respectively, *supra*. For the reasons discussed in those sections, these arguments lack merit.

Acklin's fifth point asserts that the State failed to question prospective jurors regarding several of the justifications it later used to remove them from the jury. For

example, Acklin notes that the State removed four black venirepersons from the jury because of their criminal histories. *See* T.R. 377–78 (Ms. Lockhart); T.R. 382 (G. Scruggs); T.R. 387 (F. Horton); T.R. 388 (J. Walker). Acklin takes issue with the fact that the State did not ask these individuals any questions regarding the jurors' criminal histories. He also notes that the State removed four black venirepersons from the jury due to their familiarity with Acklin or other parties to the case. *See* T.R. 377–78 (Ms. Lockhart); T.R. 383–84 (G. Scruggs); T.R. 385 (P. Way); T.R. 387 (F. Horton). Acklin faults the State for not engaging in any meaningful questioning of the jurors on this topic, noting that none of these jurors said that their familiarity with the Acklin family or the defense would have any bearing on their ability to weigh the evidence impartially.

As with previous subclaims, Acklin never mentioned potential jurors G. Scruggs, F. Horton, J. Walker, or P. Way on direct appeal to the ACCA, and he certainly did not argue that the State failed to "engage in any meaningful questioning of the jurors" about "their purported criminal history" or "their supposed familiarity with Acklin or other parties." Because he failed to present the "particular legal basis and specific factual foundation" of this subclaim, it is due to be denied as procedurally defaulted. *McNair*, 416 F.3d at 1302.

On the merits, alternatively, the claim fails. In *Batson*, the Supreme Court instructed that "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." 476 U.S. at 97. However, "the mere fact that . . . counsel decided to exercise peremptory challenges against jurors who had not been extensively questioned during voir dire does not establish a discriminatory purpose." *Lowder Realty Co.*, 236 F.3d at 638. In *Lowder Realty Co.*, the Eleventh Circuit noted that "[t]his is particularly true since the venire members had all filled out questionnaires preceding jury selection, making it likely that one or both sides would attempt to strike jurors based solely on their answers on the questionnaire." 236 F.3d at 638. The same is true here. Moreover, Acklin has not alleged any disparate treatment in either the questioning or striking of jurors with those characteristics. The State struck every veniremember with prior offenses, regardless of race, *see* Vol. 8, Tab #R-14, at T.R. 378, 390, and there is no allegation that the State failed to strike anyone who was acquainted with Acklin's family or defense counsel. The claims about these new jurors fail individually and would not have been considered as part of the totality of relevant facts, even if they had been fairly presented to the state courts.

       5.     *Acklin's subclaim that the state courts' failure to consider "all relevant circumstances" involved an unreasonable application of*

*clearly established Federal law and resulted in a decision based on an unreasonable determination of the facts*

Here, Acklin largely repeats arguments from the previous four subclaims. For the same reasons that he is due no relief on his previous four subclaims, he is due no relief on this claim.

### D.   Acklins' claim that the method for selecting the grand jury systematically excluded black people and resulted in a violation of the fair-cross-section requirement as contemplated by the First, Fifth, Sixth, Eighth, and Fourteenth Amendments

Acklin next argues that the grand jury that indicted him was selected through a procedure that systematically underrepresented black people. Acklin points out that at the time he was indicted, Madison County had a black population of around 19%. T.R. at 157. Acklin thus contends that the 18-person grand jury that indicted him should have included at least three black members, but it had no black members. Acklin further points out that at the time of his indictment in Madison County, slips of paper with the names of the prospective jurors on them were placed in a box and one of six state circuit judges would draw slips of paper from the bowl. T.R. at 115. Acklin blames this procedure for producing an all-white grand jury, arguing that it made it "easier for those to discriminate who are of a mind to discriminate." *Avery v. Georgia*, 345 U.S. 559, 562 (1953). He further notes that after he was indicted, the

Madison County Circuit Court abandoned the slips-of-paper approach and replaced it with random selection by computer. T.R. at 115.

Acklin raised this claim on direct appeal to the ACCA, which addressed it as follows:

>    Acklin argues that his constitutional rights to due process and equal protection and his right to a fair and impartial jury were denied because, he says, African–Americans were underrepresented on the grand jury that indicted him and the jury venire from which the petit jury was struck. Acklin argues that the facts that no African–Americans were selected to sit on the grand jury and that only 10 African Americans were selected as part of the 100–person venire established evidence of a systematic exclusion of African–Americans in the Madison County jury selection process.

>    Facts presented at trial indicated that the African-American population in Madison County represents 19.2 % of the total population of the county. The grand jury and the jury venire were randomly selected from a combination of the list of residents of Madison County to whom driver's licenses had been issued and the nondriver's license identification card list for Madison County. The grand jury was selected by a judge who randomly pulled 18 names from a bowl containing the names on both lists. The jury venire was selected by a computer program that randomly selected 100 names from the combined lists. Acklin argues that the change in the procedure from a manual selection of names pulled from a bowl to the use of a computer program is further evidence that the manual selection process used to select the grand jury must have resulted in a systematic exclusion of African–Americans.

>>    The Sixth Amendment requires that [grand juries and] petit juries "be drawn from a source fairly representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S. Ct. 692, 702, 42 L.Ed.2d 690 (1975). When raising a claim under this

requirement, a defendant "has the burden of establishing a prima facie case of a 'fair cross section' violation." *Rayburn v. State* 495 So. 2d 733 (Ala. Crim. App. 1986); *Pierce v. State*, 576 So. 2d 236, 241 (Ala. Crim. App. 1990), cert. denied, 576 So. 2d 258 (Ala. 1991).

*Sistrunk v. State*, 630 So. 2d 147, 149 (Ala. Crim. App. 1993).

The Supreme Court of the United States in *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L.Ed.2d 579 (1979), established a three-pronged test that must be met before an individual can establish a violation of the "fair-cross-section" requirement. The individual alleging a violation must prove:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S. Ct. at 668, 58 L.Ed.2d at 587.

. . .

"In the absence of a showing of systematic exclusion, the showing of a disparity between the percentage of blacks in the population of the county in which venue is situated and the percentage of blacks on the venire does not establish a violation of the fair cross section requirement." *Stewart v. State*, 623 So. 2d 413 (Ala. Crim. App. 1993).

*Sistrunk*, 630 So. 2d at 150.

*McNair v. State*, 706 So. 2d 828, 841–42 (Ala. Crim. App.), cert. denied, 706 So. 2d 828 (Ala. 1997), cert. denied, 523 U.S. 1064, 118 S. Ct. 1396, 140 L.Ed.2d 654 (1998), *quoting Dobyne v. State*, 672 So. 2d 1319, 1328–29 (Ala. Crim. App. 1994).

> "Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury." *Stanton v. State*, 648 So. 2d 638, 641 (Ala. Crim. App. 1994).

> "The third *Duren* [*v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L.Ed.2d 579 (1979)] element—that there has been a systematic exclusion of a distinctive group—constrains a defendant to establish that 'the cause of the underrepresentation was . . . inherent in the particular jury selection process utilized.' *Duren*, 439 U.S. at 366, 99 S. Ct. at 669." *Sistrunk v. State*, 630 So. 2d [147, 149 (Ala. Crim. App. 1993)]. Additionally, "with regard to the second and third *Duren* elements, a defendant asserting a fair cross-section violation 'must demonstrate . . . not only that [blacks] were not adequately represented on his jury venire, but also that this was the general practice in other venires.' *Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir. 1986)." *Sistrunk v. State*, 630 So. 2d at 150. In this case, there was absolutely no showing either that random . . . selection of licensed drivers inherently results in underrepresentation of blacks on [grand juries or] jury venires in [Madison] County or that blacks had been underrepresented on other venires in [Madison] County.

*Travis v. State*, 776 So. 2d 819, 838 (Ala. Crim. App. 1997), aff'd, 776 So. 2d 874 (Ala. 2000).

The trial judge did not err in denying Acklin's motions to quash the indictment or the jury venire because of underrepresentation of African-Americans on the grand jury and jury venire.

*Acklin*, 790 So. 2d at 984–96.

Acklin claims that the ACCA's decision was contrary to and involved an unreasonable application of clearly established federal law, and it was based on an unreasonable determination of the facts in light of the evidence presented in the Alabama courts. *See* 28 U.S.C. § 2254(d).

However, Acklin cannot meet his burden. Acklin relies on *Vasquez v. Hillery*, 474 U.S. 254 (1986), and other cases applying it, which held that under the Fourteenth Amendment's Equal Protection Clause, a "criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded." *Id.* at 262. However, he does not cite *Duren v. Mississippi*, the controlling precedent for this claim, in which the Supreme Court established the three-prong test for determining whether a jury venire was drawn from a fair cross-section of the community. 439 U.S. 357 (1979).

The ACCA analyzed the claim under *Duren* and found that there was no error. To be granted relief, Acklin had to 1) establish that the cause of the underrepresentation was inherent in the particular jury selection process utilized; 2) demonstrate not only that black individuals were not adequately represented on his jury venire; but also 3) that this was the general practice in other venires. *See id.* at

Case 5:18-cv-00885-LSC   Document 27   Filed 09/30/21   Page 118 of 147

366. Acklin offered no evidence at all showing either that random selection of licensed drivers and other non-licensed residents inherently results in underrepresentation of black residents on grand juries in Madison County or that black residents had been underrepresented on other venires in Madison County. To the extent Acklin insinuates that the county's move from a system in which names were randomly drawn from a receptable by a judge to a computerized system is suspect, he has not alleged that any particular judge or the Clerk of Court of Madison County made any deliberate attempts to exclude black jurors under the prior system. Nor has Acklin anywhere alleged that the facts of *Avery v. Georgia* are analogous to the facts of this case. *See Avery*, 345 U.S. at 631 (the judge hand-picked jury selection cards; black candidates had yellow cards while white candidates had white cards). Additionally, as noted by Respondent, both the computerized model and the name-drawing model should occasionally produce an all-white grand jury.

Moreover, there is no clearly established federal law as determined by the Supreme Court on whether selection from a list of licensed drivers and other non-licensed residents or whether randomly drawing names from a receptacle are unacceptable jury-selection procedures. Indeed, in 2010 the Supreme Court stated that "neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools."

*Berghuis v. Smith*, 559 U.S. 314, 329 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles*, 556 U.S. at 122 (cleaned up). The conclusion that Acklin failed to prove systematic exclusion under *Duren* was not so outrageous that no fairminded jurist could agree with it, and his contrary opinion is not sufficient for habeas relief.

**E.    Acklin's claim that the method for selecting the petit jury systematically excluded black people and resulted in a violation of the fair-cross-section requirement as contemplated by the First, Fifth, Sixth, Eighth, and Fourteenth Amendments**

Similar to the preceding claim, Acklin argues that there was systemic underrepresentation of black people in Madison County's petit jury venire. In support, he recounts that the petit jury venire at his trial was selected by computer that randomly selected 100 names from a database of driver's licenses and state identification cards. T.R. at 159.  At the time Acklin was indicted, Madison County had a black population of around 19%. T.R. at 157. Therefore, according to Acklin, the 100-person petit jury venire should have included at least 19 black members. He argues that due to systematic underrepresentation of black people in Madison County's petit jury venires, only ten black people were on the venire at his trial. T.R. at 158.

As discussed in the preceding section, Acklin raised this claim on direct appeal to the ACCA, which denied it on the merits. *See Acklin*, 790 So. 2d at 984–96, quoted in section IV.D., *supra*.

Acklin's claim that the ACCA's decision was contrary to and involved an unreasonable application of clearly established federal law, and it was based on an unreasonable determination of the facts in light of the evidence presented in the Alabama courts, *see* 28 U.S.C. § 2254(d), similarly fails. Acklin again fails to cite *Duren*. Instead, he relies on *Taylor v. Louisiana*, in which the Supreme Court reiterated that a criminal defendant is entitled to "an impartial jury drawn from a fair cross section of the community." 419 U.S. 522, 535 (1975) (holding that systematic exclusion of women during the jury selection process denies a criminal defendant that right). *Duren* reaffirmed and clarified the inquiry required by *Taylor*. *See generally* 439 U.S. 357.

Moreover, Acklin has no particularized criticisms of the randomized computer method for selecting jury venirepersons. Ten of the 100 veniremembers were black. The difference between the percentage of black veniremembers (10%) and black Madison County residents (19.2%) is 9.2 percent. "Under Eleventh Circuit precedent, if the absolute disparity between these two percentages is ten percent or less, the second element [of the *Duren* test] is not satisfied." *United States v. Davis*,

854 F.3d 1276, 1295 (11th Cir. 2017) (cleaned up). Acklin does not allege

underrepresentation on other petit jury venires nor make any argument about how

the randomized computer jury-selection method would inherently exclude black

residents of Madison County. The conclusion that Acklin failed to prove systematic

exclusion under *Duren* was not so outrageous that no fairminded jurist could agree

with it, and he is due no relief.

### F.    Acklin's claim that the trial court erroneously struck potential juror M. Daniell for cause

Acklin's next claim is that the trial court violated his Sixth and Fourteenth

Amendment rights when it struck potential juror M. Daniell ("Ms. Daniell) for

cause. He raised this claim on direct appeal before the ACCA, which denied the

claim on the merits, discussing the claim as follows:

> Acklin next argues that the trial court erred in granting the prosecution's challenge for cause against prospective jurors M.D. and A.M.
>
> . . .
>
> The prosecution challenged M.D. because of her opposition to the death penalty. Acklin argues that M.D., while indicating that she was opposed to the death penalty, agreed that she could consider it in certain circumstances. He also complains that he should have been allowed further voir dire questioning in his attempt to further "rehabilitate" the veniremember. The following took place during the questioning of M.D. during voir dire:

THE COURT: [M.D.], is your opinion against the imposition of the death penalty so fixed and so certain that you would under no circumstances impose the penalty of death no matter what the evidence was?

M.D.: I believe it is.

THE COURT: Alright, are you telling me that if this case should reach the penalty phase and you were a juror, would you automatically vote against the death penalty?

M.D.: Yes.

(R. 215–16.) Then, after M.D. said that she thought she could be fair and impartial during the guilt phase of the trial, but that she would still automatically vote against a death sentence, the defense counsel asked her these questions:

MR. MCDANIEL (defense counsel): And obviously, we don't know what the Judge is—we don't know what his position is on the death penalty either way. He is here because it is his civic duty to be here. If there were a guilty verdict and you said you could serve on the jury and decide guilt or innocence, then the Judge would charge the jury on aggravating circumstances and mitigating circumstances. In other words, there are statutory aggravating circumstances and statutory mitigating circumstances; reasons you would not recommend the death penalty and there are nonstatutory mitigating circumstances; things that are not in the law, but the defense comes up where the jury can recommend life without parole instead of the death penalty. What I am asking you, obviously you're here because it is your civic duty, if you were on the jury and in the penalty phase and the Judge told you about aggravating and mitigating circumstances and if you felt the aggravating circumstances in this case outweighed the mitigating circumstances and the Judge would instruct you [that] it

would be your duty to make that recommendation of death, could you abide by the law if you were on the jury? Could you abide by the law if you felt the aggravating circumstances outweighed the mitigating circumstances—could you abide by the law and recommend the death penalty?

M.D.: If I did not have a choice?

MR. McDANIEL: Yes, ma'am. If you were on the jury and you heard there would be a second phase—if there was a guilty verdict, there would be a second phase of this trial and in that trial, the State could introduce evidence of aggravating circumstances; reasons you should recommend the death penalty. The defense could then come in and argue mitigating circumstances where you should not give the death penalty and the Judge will charge you that you are to weigh the aggravating and mitigating circumstances—just you, as a juror, to weigh the aggravating and mitigating circumstances and the Judge will tell you if you felt like the aggravating circumstances outweighed the mitigating circumstances, you should recommend the death penalty. What I am saying to you—

M.D.: Based on the whole?

MR. McDANIEL: Yes, ma'am.

M.D.: Yes, I understand. I would have to go with the circumstances that weighed the most.

MR. McDANIEL: But you could go by the law, couldn't you?

M.D.: Right.

MR. McDANIEL: You would listen to aggravating circumstances and mitigating circumstances and would go

by the law and you are saying you would give more weight to the mitigating circumstances, but if the aggravating circumstances outweighed that, you could go by the law, couldn't you?

M.D.: Yes.

MR. McDANIEL: Even if that meant the imposition of the death penalty, voting for the death penalty?

M.D.: Yes, if I understand correctly; I'm not sure I understand.

(R. 215–18.) At this point, both the prosecutor and defense counsel began asking M.D. numerous questions regarding whether she could follow her conscience or could follow the law and vote for the death penalty. With the questioning going back and forth, at one point, M.D. exclaimed, "I am confused. I'm in a whirlwind." (R. 218–20.) M.D. was ultimately excused from the courtroom, and the parties argued regarding the challenge for cause. The trial judge then brought M.D. back into the courtroom and allowed more questioning:

MR. TAYLOR (prosecutor): Now, if we get past the guilt phase of this trial and go to the penalty phase, as Mr. McDaniel said, there will be certain aggravating circumstances to make it look bad and there will be some mitigating circumstances which cut in favor of the defendant. And the Judge will ask you to weigh these and vote your conscience on whether or not he should be put in the electric chair or put in prison for the rest of his life without parole. And if you vote your conscience, what will your vote be after listening to the aggravating circumstance and mitigating circumstances? And I ask you that because you originally said you could never vote for the death penalty. You will have a choice; what would your vote be?

M.D.: For life without parole.

THE COURT: Okay, then I have to ask you this, again. Are you back to telling us that regardless of the—if the defendant is found guilty of capital murder, you're telling me that regardless of whether the aggravating circumstances outweigh the mitigating circumstance, that you would vote for—that you would automatically vote against the death penalty?

M.D.: Right.

MR. McDANIEL: Can I ask a question? Well, what we talked about awhile ago was this—and let me put it in, I think, simple terms. Colonel Taylor talked about conscience and I was going more on law, okay? And so let me ask you, because we are in a court of law here, you won't be put in—if there is a verdict of guilty—you won't be put in the jury box and just, you know, a whole bunch of hodgepodge of stuff coming at you and they ask you to vote your conscience; there—it will be an orderly situation, procedure. The State will give an opening statement and the defense will give an opening statement. The State will put on witnesses for aggravating circumstances, for reasons—this is another trial—the reasons [it] should— that you should recommend the death penalty and then at that point [it rests] and the defense can put on witnesses to show mitigating circumstances, reasons we feel like our client's life should not be taken, okay? And after that, the Judge will tell you—you know, both lawyers argue final arguments. The prosecutor argues to the jury a final argument and the defense gets a final argument. He argues he should be given the electric chair and we argue he should be given life imprisonment without parole and the Judge will tell you the law at that point right there. This is a court of law and he will tell you the law and the law will be, that you will be weighing aggravating and mitigating circumstances, okay? And when I asked you awhile ago— this being a court of law, everybody in here has emotions—

now, everybody has a conscience and emotions. We are in a court of law, and if you heard—after all their testimony about aggravating circumstances and you felt like [the State's] aggravating circumstances legally outweighed any mitigating circumstances that we put on and you felt like that, legally, could you then vote for the death penalty? If you felt legally, after hearing the Judge's legal charge to you? Everybody has a conscience and everybody has got feelings. What I am asking: Will you go by the law? We are in a court of law here. This is not out on the street. We are in this courtroom—listen to the law on aggravating circumstances and mitigating circumstances and if you feel like the aggravating circumstances outweigh the mitigating circumstances and that is the law, will you go by the law?

M.D.: Can I ask a question?

MR. McDANIEL: Yes, ma'am.

M.D.: If I feel the aggravating circumstances do outweigh the mitigating circumstances, I still would have a choice to go with life without parole and that is the choice I would take. I would take it.

(R. 222–225.) Then, after counsel argued some more, defense counsel asked other questions:

MR. McDANIEL: If the defense did not put on any mitigating circumstances at all and all you had was the State putting on aggravating circumstances and that is all you had and the Judge charged you on the aggravating circumstances outweighed the mitigating circumstances and we did not put on any mitigating circumstances, could you then vote for the death penalty if we did not put on any mitigating circumstances?

M.D.: I guess I don't follow.

> THE COURT: Let me try to see if—let me ask you this....
> Let me first say, that while the Court will give you
> instructions, the ultimate choice as to whether you vote for
> the death penalty or life without parole is an individual
> decision each juror must make. If, after listening to both
> the aggravating and mitigating circumstances in the case,
> can you envision any situation in which you would vote for
> the death penalty?
>
> M.D.: No.
>
> MR. McDANIEL: Let me ask you—
>
> THE COURT: No. We have gone on and on and it is just
> — the Court has to have some discretion in stopping the
> process at some point.

(R. 226–27.) At this point, the trial judge sustained an objection to defense counsel's attempting to ask M.D. about whether she could vote to impose the death penalty in a case involving a torture murder or a baby killing; the trial judge then sustained the challenge for cause. (R. 227.)

The "original constitutional yardstick" on this issue was described in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L.Ed.2d 776 (1968). Under *Witherspoon*, before a juror could be removed for cause based on the juror's views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause based on the veniremember's opposition to the death penalty is whether the veniremember's views would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The Supreme Court has expressly stated

that juror bias does not have to be proven with "unmistakable clarity." *Darden v. Wainwright*, 477 U.S. 168, 106 S. Ct. 2464, 91 L.Ed.2d 144 (1986).

> After reviewing the voir dire examination, we conclude that the trial court did not err in granting the challenge for cause against prospective juror M.D. The trial court could reasonably have concluded—when assessing the repeated comments by M.D. that she would "take the choice" of life imprisonment without parole and that she could envision no circumstances under which she could vote for a sentence of death—that she meant that she believed unequivocally that she could not impose the death penalty regardless of the evidence presented or that her views would prevent or substantially impair the performance of her duties as a juror in accordance with the instructions of the court and her oath. *See Watkins v. State*, 509 So. 2d 1071 (Ala.), aff'd. on remand, 509 So. 2d 1071, 1073 (Ala. Cr. App. 1986), aff'd, 509 So. 2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S. Ct. 269, 98 L.Ed.2d 226 (1987), and the cases cited therein.

> The scope of the voir dire examination is left largely to the discretion of the trial court and its decision on that matter will not be disturbed on appeal on the ground that the voir dire was limited, absent an abuse of that discretion. *Nodd v. State*, 549 So. 2d 139 (Ala. Crim. App. 1989). Our review of the record indicates that the trial judge allowed both parties extensive voir dire examination of M.D., even though the questioning often contained long speeches and compound questions that served only to confuse the potential juror. We do not believe that further questioning would have changed M.D.'s unequivocal answer that she could not envision a circumstance in which she could vote to impose the death penalty. The trial judge did not abuse his discretion in cutting off voir dire questioning of M.D. *Smith v. State*, 698 So. 2d 189, 198 (Ala. Crim. App. 1996), aff'd, 698 So. 2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S. Ct. 385, 139 L.Ed.2d 300 (1997).

*Acklin*, 790 So. 2d at 989–93.

Acklin argues that the ACCA's determination of the claim was contrary to or involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented in the Alabama courts. *See* 28 U.S.C. § 2254(d).

Acklin does not explicitly argue that the ACCA's decision was contrary to a particular Supreme Court case, but he cites *Witherspoon v. Illinois* for the following proposition: "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. 510, 522 (1968). He further cites *Wainwright v. Witt* for the rule that a prospective juror may only be excused for cause if her or his views would "prevent or substantially impair the performance of [her or] his duties as a juror in accordance with his instructions and his oath." 469 U.S. 412, 424 (1985). The ACCA identified these two cases as the relevant Supreme Court authority and then rationally and thoroughly discussed Ms. Daniell's individual voir dire. Although all state court decisions are entitled to a high level of deference under the AEDPA, the Supreme Court has explained that "federal habeas review of a *Witherspoon–Witt* claim—much like federal habeas review of an ineffective-

assistance-of-counsel claim—must be doubly deferential." *White v. Wheeler*, 577 U.S. 73, 78 (2015) (cleaned up).

Acklin does argue that the ACCA's decision was based on an objectively unreasonable determination of the facts because what he calls Ms. Daniell's "personal preference for a life sentence" did not support the finding that "she believed unequivocally that she could not impose the death penalty regardless of the evidence presented or that her views would substantially impair the performance of her duties as a juror in accordance with the instructions of the court and her oath." *Acklin*, 790 So. 2d at 993. Acklin emphasizes that Ms. Daniell stated at one point in her individual voir dire that she could "go with the circumstances that weighed the most" if the law required her to do so. Vol. 7, Tab #R-13, at TR. 218.

Acklin's discussion of Ms. Daniell's individual voir dire does not accurately capture her answers and her belief that she could not impose the death penalty. Initially, Ms. Daniell wrote on her questionnaire, "I feel completely uncomfortable with the idea of deciding to take another person's life, regardless of the evidence/circumstances presented." Vol. 3, at C. 600. During individual voir dire, she was asked, "[I]f this case should reach the penalty phase and you were a juror, would you automatically vote against the death penalty?" and she responded, "Yes." Vol. 7, Tab #R-13, at TR. 215–16. After that, defense counsel and the

prosecutors asked her a number of lengthy and convoluted questions, which left her confused. *See id.* at TR. 220 ("I am confused. I'm in a whirlwind."). Following additional questioning, the trial judge asked her, "[Y]ou're telling me that regardless of whether the aggravating circumstances outweigh the mitigating circumstances, that you would vote for—that you would automatically vote against the death penalty?" and she responded, "Right." *Id.* at T.R. 223. At that point, defense counsel attempted to rehabilitate her with additional complicated questions, culminating in asking her about whether she might recommend death in the context of "a torture murder case or a baby getting killed," at which point the trial court shut down the questioning and granted the State's challenge for cause. *See id.* at T.R. 227. Acklin's claim that there was no cause for excusing Ms. Daniell is not supported by the record, and the ACCA's determination that Ms. Daniell's views would have substantially impaired her performance was certainly not so outrageous that no fairminded jurist could agree with it. Habeas relief is not due to be granted on this claim.

### G.   Acklin's claim that the trial court incorrectly told jurors that their sentencing determination was only a recommendation

Acklin next argues that the trial court's statements to the jury venire at the beginning of the trial violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments. The trial court instructed jurors that, at the conclusion of

the penalty phase, they "would return a recommendation—a verdict or recommendation to the Court that either there be a sentence of death or that there be a sentence of life without parole." T.R. 149. The trial court further stated that "regardless of which verdict you return, the Court later holds another sentencing hearing without a jury and the Court ultimately determines whether to abide by the jury's recommended verdict or whether the Court will impose another verdict." T.R. 149. Acklin's defense counsel objected to the trial court's comments and moved to quash the venire. T.R. 159–60. Defense counsel argued that the trial court's statements "lessen[ed] the—their job or their decision making process," leading jurors to "believe[] they are merely making some kind of recommendation," and that jurors would not consider the matter "like they would if . . . they were not told they were merely making a recommendation." T.R. 160. The trial court denied the motion. T.R. 162.

Acklin raised this claim on direct appeal to the ACCA, which denied it on the merits in the following discussion:

Acklin next argues that the comments of the trial judge in his opening instructions to the jury diminished the importance of the jury's role in sentencing, in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L.Ed.2d 231 (1985). In his opening instructions to the jury, the trial judge stated:

There are two stages of a capital murder trial; the guilty stage and penalty stage. The—during the first phase of the

trial, the jury determines whether or not the defendant is guilty of the three charges against him—capital murder and two counts of attempted murder. If you find the defendant guilty of capital murder, you proceed to a second stage called the penalty phase and at that time, after listening to evidence, you would return a recommendation—a verdict or recommendation to the Court that either there be a sentence of death or that there be a sentence of life without parole. If you return a—well, regardless of which verdict you return, the Court later holds another sentencing hearing without a jury and the Court ultimately determines whether to abide by the jury's recommended verdict or whether the Court will impose another verdict.

(R. 149.)

In *Martin v. State*, 548 So. 2d 488 (Ala. Crim. App. 1988), aff'd, 548 So. 2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S. Ct. 419, 107 L.Ed.2d 383 (1989), this court reiterated the United States Supreme Court's holding in *Caldwell v. Mississippi*. The *Martin* court stated:

Under *Caldwell v. Mississippi*, 472 U.S. 320, [327], 105 S. Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was "advisory" and a "recommendation" and that the trial court would make the final decision as to sentence does not violate *Caldwell*. "[C]omments which accurately explain the respective functions of the judge and jury are permissible under *Caldwell* 'as long as the significance of [the jury's] recommendation is adequately stressed.'" *Harich v.*

*Wainwright*, 813 F.2d 1082, 1101 (11th Cir. 1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of *Caldwell*, *supra*; *Mann v. Dugger*, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); *Adams v. Wainwright*, 804 F.2d 1526 (11th Cir. 1986), modified, *Adams v. Dugger*, 816 F.2d 1493 (11th Cir. 1987); and *Harich*, *supra*, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In *Hooks v. State*, 534 So. 2d 329 (Ala. Crim. App. 1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: "The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under *Caldwell*, supra."

*Martin*, 548 So. 2d at 494.

After reviewing the record, as well as the context in which the instruction was given, we find that "there is 'no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law.'" *Price v. State*, 725 So. 2d 1003 (Ala. Crim. App. 1997), aff'd, 725 So. 2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S. Ct. 1809, 143 L.Ed.2d 1012, (1999), quoting *Taylor v. State*, 666 So. 2d 36, 51 (Ala. Crim. App. 1994). "[T]he trial court's instructions 'accurately informed the jury of its sentencing authority and in no way minimized the jury's role and responsibility in sentencing.'" *Weaver v. State*, 678 So. 2d 260, 283 (Ala. Crim. App. 1995), rev'd on other grounds, 678 So. 2d 284 (Ala. 1996). There is no error here.

*Acklin*, 790 So. 2d at 994–96.

Although Acklin does not explicitly argue that the ACCA's decision was contrary to clearly established federal law, pursuant to § 2254(d), he does cite *Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."). However, the Supreme Court has explained that "to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (cleaned up). Likewise, the Eleventh Circuit has "held that references to and descriptions of the jury's sentencing verdict as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority do not constitute *Caldwell* violations where they accurately characterize the jury's and judge's sentencing roles under state law." *Carr v. Schofield*, 364 F.3d 1246, 1258 (11th Cir. 2004) (cleaned up). Acklin does not dispute that Alabama law at the time of his trial provided that the jury's role in the penalty phase was advisory. Thus, the instruction that the jury's verdict was a recommendation was entirely consistent with Alabama law. Acklin cannot show that the denial of his *Caldwell* claim was so outrageous that no fairminded jurist could agree with it.

135

**H.**   **Acklin's claim that the trial judge erroneously denied his motion for a change of venue due to extensive prejudicial pretrial publicity**

Acklin's final claim is that the trial court's refusal to order a change of venue despite extensive prejudicial pretrial publicity violated his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.

Acklin's defense counsel moved for a change of venue prior to the trial. At a pretrial hearing, defense counsel represented that Acklin had been mentioned at least 127 times in media reports since September 26, 1996, and he described several allegedly prejudicial comments that appeared in connection with Acklin's name. Vol. 6, T.R. at 15–23. The trial court denied the pretrial motion for a change of venue in a written order. Vol. 1, T.C. at 82.

Defense counsel again moved for a change of venue at the close of voir dire, this time pointing out that 86 out of the 100 potential jurors had been exposed to pretrial publicity and citing "extensive questions and extensive voir dire by both the State and defense" as grounds for establishing prejudicial pretrial publicity. T.R. at 359–60. The trial court again denied the motion for change of venue, T.R. 360.

In support of this claim in this federal habeas petition, Acklin largely relies on particular statements by veniremembers to contend that a change of venue was warranted. For example, he points out that prospective juror J. Coffman remembered encountering news coverage "at least five to ten times in the paper and

numerous times on television" and described the reports as "gory" and containing "all kinds of gruesome details." T.R. 205–06. He also points out that prospective juror D. Johnson remembered seeing the case in the newspaper "so often" and on television "every time I turn it on" and that she concluded that Acklin "was there, he pulled the trigger, his fingerprints were on the gun." T.R. 208. Acklin also quotes the veniremembers' responses to their questionnaires: P. Barber had "heard TV reports of this trial and Wilson verdict." T.C. 406; B. Biez had heard it was a "quadruple murder known as 'cell phone' case involving young people." T.C. 439; W. Cline had "heard about Joey 'Doughboy' Wilson case." T.C. 557; T. Fegenbush had "heard that this case may involve an argument over a cell phone." T.C. 656; M. Richards had "read about the Joey Wilson case & seen TV news accounts." T.C. 1152; M. Sapp had "heard about other facts from previous trial." T.C. 1207; and T. Spencer "followed [the case] in the newspaper and TV the whole time." T.C. 1295.

However, insofar as Acklin relies upon these statements by potential jurors in support of his change of venue claim, he did not present that argument to the ACCA on direct appeal. Indeed, Acklin mentioned no specific jurors whatsoever in his direct appeal brief. Instead, his direct appeal argument focused solely on local news media discussing the case as follows:

> In the case sub judice, the defense filed a motion for change of venue. Prior to trial a hearing was held on said motion. (R.13-23).

137

During the hearing, evidence was presented concerning the following references to this case in the local news media: The name Nick Acklin was mentioned 127 times. The phrase "deadly payback" was mentioned once. "Six people shot" was mentioned three times. "Act of revenge" was mentioned six times. "Beaten and tortured" was mentioned seven times. "Capital murder" mentioned 34 times. "Deadly shooting" mentioned eleven times. 'Death penalty" was mentioned one time. "Deaths of four" was mentioned five times. "Grizzly midnight murder" was mentioned twice. "Head wounds" was mentioned six times. "Madison County's most brutal crime scene" was mentioned three times. "Mass shooting" was mentioned once. "Massacre" or "Bloody Massacre" was mentioned four times. "Most gruesome ever in Madison County" was mentioned once. "Multiple deaths" was mentioned four times. 'Multiple murders" was mentioned 23 times. "Multiple shootings" was mentioned three times. The term "murder" was mentioned five times. "Murder of four" was mentioned twice. "Murdered execution style" was mentioned sixteen times. 'Murdered" or "gunned down" was mentioned 22 times. "People found dead" was mentioned 2l times. "Pistol whipped" was mentioned once. "Quadruple murder" was mentioned four times. "savage crime" was mentioned once. 'Shocking incident" was mentioned twice. "shootout" was mentioned three times. "Shooters" was mentioned seven times. "Shooting spree" as mentioned once. "shooting victims" was mentioned 52 times. "shootings were in retaliation for a theft report" was mentioned once. "Shot and killed" was mentioned 29 times. "slaying the victims" was mentioned six times. "Tragic shooting" was mentioned three times. The term "trio" referencing the three co-defendants was mentioned five times. "Unbelievable scene" was mentioned once. "Worst crime 'scene" was mentioned twice.

Additionally, the media quoted the Sheriff of Madison County as saying "this was the worst murder scene I have every[sic] seen"; "The killers were hyped up on coke and acid and that doesn't sound farfetched at all"; "killed in a midnight massacre"; 'three men sporadically shoved a pistol in their mouths before the shooting began"; "they settled the dispute by shooting everyone in Rutherford's room"; "crime scene identified as being one of the most gruesome every in

Madison County"; "Huntsville's bloodiest killings"; "killed in a hail of gunfire"; "Victims were allegedly pistol whipped, an assault that lasted up to an hour before they were shot." (R.15-17).

Clearly, inadmissible evidence and evidence otherwise outside the province of proper jury consideration at trial was publicized so extensively and in a manner so prejudicial to the interests of Mr. Acklin that the constitutional rights guaranteed him by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and by other applicable state law were violated.

The trial court took the matter under advisement (R.23) and eventually denied the motion to change venue. (CR.82).

Mr. Acklin respectfully maintains that the trial erred to reversal in denying his motion to change venue.

Vol. 11, Tab #R-39, at 66–70. Accordingly, to the extent Acklin now relies upon the statements and questionnaire responses of potential jurors in support of his claim that the motion to change venue should have been granted, any such claim is procedurally defaulted for failure to raise it before the state courts. *See McNair*, 416 F.3d at 1302.

In the alternative, Acklin's claim insofar as it is premised on the veniremembers' statements is without merit. In analyzing whether a defendant's trial was deprived of fundamental fairness by pretrial publicity or an inflamed community atmosphere, courts consider both an "actual prejudice" standard and a "presumed prejudice" standard. *See Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983) (citing *Irvin v. Dowd*, 366 U.S. 717 (1961); *Rideau v. Louisiana*, 373 U.S. 723

(1963); *Sheppard v. Maxwell*, 384 U.S. 333 (1966)). It is unclear from his petition whether Acklin is alleging actual prejudice or presumed prejudice. Regardless, he can prove neither.

For actual prejudice, Acklin must show "that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty." *United States v. Langford*, 647 F.3d 1309, 1332 (11th Cir. 2011) (cleaned up). However, none of the jurors that he names in this section served on his final jury. *See* Vol. 8, Tab #R-14, at TR. 400. Thus, he has "presented no facts showing actual prejudice on the part of the jurors who were selected to try his case." *Presnell v. Zant*, 959 F.2d 1524, 1534 (11th Cir. 1992); *see also Skilling v. United States*, 561 U.S. 358, 391 n.24 (2010) ("In considering whether Skilling was tried before an impartial jury, the dissent relies extensively on venire members not selected for that jury. . . . Statements by nonjurors do not themselves call into question the adequacy of the jury-selection process; elimination of these venire members is indeed one indicator that the process fulfilled its function.").

For presumed prejudice, the Supreme Court has stated that an impartial jury is not one in which the jurors must be totally ignorant of the facts and issues involved in the case. *Irvin*, 366 U.S. at 722. Further, "juror exposure to news accounts of the crime alone" does not "presumptively deprive[] the defendant of due process."

140

*Price v. Allen*, 679 F.3d 1315, 1321 (11th Cir. 2012) (quoting *Skilling*, 561 U.S. at 391).

Here, juror exposure in the form of testimony and questionnaire answers is the only

evidence Acklin relies on. As in *Price*, Acklin "did not submit to the [state] court[s]

any articles that had been published near to or during the trial." *Id.*

With regard to media coverage, the ACCA denied the change of venue claim

on the merits, writing:

> Acklin argues that the trial judge erred in not granting his motion
> for a change of venue. Acklin argues that the community was so
> saturated with pretrial publicity as to make it impossible for him to
> receive a fair trial in Madison County.

> Before denying the change-of-venue motion, the trial court held
> a hearing to determine the extent of the publicity surrounding the
> murders. Acklin, while presenting no evidence, argued that there had
> been extensive pretrial publicity in the form of articles in the Huntsville
> newspaper and broadcasts on Huntsville television stations. Acklin told
> the trial judge that his review of the newspaper and television coverage
> revealed that his name had been mentioned in connection with the
> murders 127 times. Acklin argued that much of the media coverage was
> emotion laden, using such terminology as "grizzly midnight murder,"
> "bloody massacre," "savage crime," and "most gruesome ever."
> Acklin recounted that the Madison County sheriff had been quoted as
> saying, "This was the worst murder or crime scene I have ever seen."
> (R. 16–17.)

> After considering Acklin's presentation and the legal authorities
> presented by Acklin, the trial judge denied Acklin's motion for a change
> of venue.

> "The right to jury trial guarantees to the criminally accused a fair
> trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366
> U.S. 717, 722, 81 S. Ct. 1639, 6 L.Ed.2d 751 (1961). "A defendant is

entitled to a change of venue if he can demonstrate to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried." § 15–2–20, Ala. Code 1975; *Nelson v. State*, 440 So. 2d 1130, 1131, (Ala. Cr. App. 1983).

> "There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity 'has so saturated the community as to have a probable impact on the prospective jurors' and thus renders the trial setting 'inherently suspect.'" *McWilliams v. United States*, 394 F.2d 41 (8th Cir. 1968); *Dobbert v. Florida*, 432 U.S. 282, 97 S. Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a "pattern of deep and bitter prejudice" must exist in the community. *Irvin v. Dowd*, 366 U.S. at 727, 81 S. Ct. 1639.

> "The second situation occurs when the defendant shows 'a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice.'" *McWilliams v. United States*, *supra*.

*Hyde v. State*, 778 So. 2d 199, 231 (Ala. Cr. App. 1998), quoting *Holladay v. State*, 549 So. 2d 122, 125–26 (Ala. Cr. App. 1988), quoting, in turn, other cases. It is the former situation that Acklin argues rendered Madison County "inherently suspect" as a trial setting.

> Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held. . . . The presumed prejudice principle is "rare[ly]" applicable, and is reserved for an "extreme situation."

*Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir. 1985) (citation omitted).

The burden is on a defendant seeking a change of venue to show, to the reasonable satisfaction of the court, that he or she cannot receive a fair and impartial trial in the county of original venue. Motions for a change of venue are addressed to the sound discretion of the trial court and its decision on such a motion will not be disturbed on appeal except for an abuse of that discretion. The sole fact that a local newspaper and area television stations reported the crime will not warrant a change of venue. *Ex parte Grayson*, 479 So. 2d 76 (Ala), cert. denied 474 U.S. 865, 106 S. Ct. 189, 88 L.Ed.2d 157 (1985). In this case, Acklin presented no evidence of the pretrial publicity, but relied solely on the argument of the defense counsel. Defense counsel told the court that he had reviewed newspaper and television transcripts and had counted Acklin's name in those transcripts 127 times. Acklin presented no evidence as to the number of news reports naming him as being involved in the murders, the frequency of those reports, when they occurred, or how saturated the community was with repeated news reports concerning his involvement in the murders. Having reviewed the record, including the extensive voir dire concerning pretrial publicity, we do not believe that Acklin has met his burden of proving the need for a change of venue. The trial judge did not err in denying Acklin's motion for a change of venue. *Woods v. State*, 789 So. 2d 896 (Ala. Crim. App. 1999).

*Acklin*, 790 So. 2d at 996–97.

Acklin argues that the ACCA's decision was contrary to or involved an unreasonable application of clearly established federal law, including *Estes v. Texas, Rideau v. Louisiana*, and *Irvin v. Dowd*, and was based on an unreasonable determination of the facts in light of the evidence presented in the Alabama courts. *See* 28 U.S.C. § 2254(d).

However, Acklin's invocation of the Supreme Court's landmark cases on prejudicial pretrial publicity falls short, as they are distinguishable on their facts. *See*

*Rideau*, 373 U.S. at 725-27 (describing as a "spectacle" the fact that "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff" and thus deciding not to examine the voir dire for actual prejudice because the trial was but a "hollow formality"); *Irvin*, 366 U.S. at 727 ("An examination of the 2,783–page voir dire record shows that 370 prospective jurors or almost 90% of those examined on point . . . entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty . . . . A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on the jury. . . . [O]f the voir dire examination of a majority of the jurors finally placed in the jury box[,] [e]ight out of the 12 thought petitioner was guilty.").

Nor was the circuit court's decision based on an unreasonable determination of the facts in light of the evidence presented. Acklin argues that it was error for the ACCA to have found that "Acklin presented no evidence as to the number of news reports naming him as being involved in the murders, the frequency of those reports, when they occurred, or how saturated the community was with repeated news reports concerning his involvement in the murders." *Acklin*, 790 So. 2d at 997. But

with regard to media coverage, the Eleventh Circuit has stated, "The fact that a case generates widespread publicity does not, in and of itself, warrant a change of venue." *Baldwin v. Johnson*, 152 F.3d 1304, 1314 (11th Cir. 1998).  Indeed, "the principle of presumed prejudice 'is rarely applicable and reserved for extreme situations.'" *Mills*, 63 F.3d at 1010 (citation omitted). The Supreme Court has explained that in each of its cases where it overturned a conviction due to a presumption of prejudice from pretrial publicity, those "'conviction[s] [had been] obtained in a trial atmosphere that was utterly corrupted by press coverage.'" *Skilling*, 561 U.S. at 380 (citation omitted) (alteration in original omitted).  The Court reiterated that those decisions, however, "'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.'" *Id.* (citation omitted). *See also Gaskin v. Sec'y, Dept. of Corr.*, 494 F.3d 997, 1005 (11th Cir. 2007) (no habeas error in denial of petitioner's motion for change of venue, even though articles published in local paper "may have been somewhat prejudicial or inflammatory").

Here, because Acklin's counsel merely described the articles without submitting them to the state courts and without even mentioning the title, publication, or date of publication of the articles, the state courts had no basis from which to determine that the community had been saturated with prejudicial pretrial

publicity. The courts could not simply take counsel's word about the objectionable nature of the articles. Without access to the actual articles, the state courts could not engage in a fact-specific review of the contents of such articles and the dates of their publication. Accordingly, Acklin has not demonstrated that the ACCA's decision was unreasonable, and habeas relief is foreclosed.

## V.   CONCLUSION

For all of the reasons set forth herein, Acklin's petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted). This Court finds Acklin's claims do not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** and **ORDERED** on September 30, 2021.

_____
L. Scott Coogler
United States District Judge

160704